JACKSON COUNTY et al,
*Petitioners,*

*v.*

BEAR CREEK VALLEY
SANITARY AUTHORITY,
*Respondent.*

(80-090; CA 19535)

632 P2d 1349

John L. DuBay, County Counsel, Medford, argued the cause and filed the brief for petitioner Jackson County.

Robert E. Stacey, Jr., Portland, argued the cause and filed the brief for petitioners City of Ashland, Oregon, League of Women Voters of Ashland, Citizens for a Livable Future, and League of Women Voters of the Rogue Valley.

Manville M. Heisel, Medford, argued the cause and filed the brief for respondent.

Dave Frohnmayer, Attorney General, John McCulloch, Jr., Solicitor General, William F. Gary, Deputy Solicitor General, and Mary J. Deits, Assistant Attorney General, Salem, filed a brief amicus curiae for Department of Land Conservation and Development.

Michael H. Arant, Medford, filed a brief amicus curiae for Special Districts Association of Oregon.

Before Buttler, Presiding Judge, and Warden and Warren, Judges.

BUTTLER, P. J.

**BUTTLER, P. J.**

Petitioners seek judicial review of a determination by the Land Use Board of Appeals (LUBA), invalidating a portion of the comprehensive plan adopted by Jackson County. We reverse and remand.

In 1976, Bear Creek Valley Sanitary Authority (BCVSA), a sanitary district operating within Jackson County, adopted a comprehensive sewer plan. In 1978, Jackson County and BCVSA entered into a cooperative agreement providing that the parties would jointly develop plans relating to levels of sewer service on rural and urban lands. On July 14, 1980, the Jackson County Board of Commissioners adopted by ordinance its comprehensive plan, including a "Public Facilities and Services-Element." In relevant part, that element contains seven policies establishing levels of sanitary service inside and outside urban growth boundaries.[1] BCVSA then sought review

---

[1] LUBA's order summarizes the seven policies:

"Policy I establishes four levels of sanitation service permissible within Jackson County and specifies where each level of service is to be allowed. Category 'A' level of service is for those areas within the city limits or within a city's urban growth boundary (UGB). The method of service for category 'A' involves conventional sewage collection and treatment as part of a regional or subregional sewage system designed to accommodate an urban level of development. Category 'B' level of service is for those areas in an unincorporated urban containment boundary or for those areas that are outside a UGB, constitute a pocket of existing urban or suburban level of development and within which a probable health hazard is deemed by the county to exist. This method of service also involves conventional sewage collection and treatment as part of a regional or subregional system, except that new service mains, trunks and lateral lines for such areas can be designed only to serve existing and in-full development.

"Category 'C' level of sewer service is for new development outside a UGB which meets the rural or suburban lands element of the county's comprehensive plan, or existing pockets of development which are outside a UGB as well as any urban containment boundary and for which a probable health hazard is deemed by the county to exist. The method of service is on-site management (i.e., septic tanks) or small community waste disposal systems.

"Finally, category 'D' level of service is for areas designated for or already developed to low density. The service method involves on-site waste disposal systems (i.e., septic tanks).

"Policy II of the public facilities and services element challenged by petitioner prohibits new extensions of sewer projects outside any UGB except as allowed by Policy I. The effect of this policy, basically, is to limit sewer line extensions outside any UGB to only those pockets of development for which a health hazard is deemed to exist. Furthermore, the sewer lines which are

before LUBA concerning the adoption of those policies, contending that the county exceeded its statutory authority in not conforming its plan to that of the sanitary district, and also violated certain statewide planning goals. LUBA invalidated the adoption of policies I, II, IV, V and VI (*supra,* n 1) on the sole ground that in adopting them the county had exceeded its statutory authority.[2] Petitioners Jackson County, the City of Ashland and three citizens' groups seek judicial review of LUBA's final order. The sole question before us is whether the county exceeded its statutory authority in adopting the policies in question. We hold that it did not.

LUBA's basic rationale is that, although planning policies relating to growth lie outside the authority of the sanitary district, those specifically relating to provision for sanitary services themselves are the exclusive province of the planning responsibilities of the sanitary district. The county is characterized by LUBA primarily as a coordinator of plans, and in the event of conflict between the county and the district in formulating sanitary service policy, the county's only recourse is to seek an enforcement order from LCDC to make the district's plan conform to the statewide planning goals. That view of the respective roles of the county and of the special service district in land use

allowed can only be of a size adequate to serve the existing development and any infill development which may be allowed.

"Policy III expresses the commitment to allow infill development in areas in which a health hazard has been removed in order that such new development may help to offset the cost of providing sewers necessary to remove the health hazard. Policy IV would effectively prohibit new development outside a UGB and outside an urban containment boundary from connecting to sewer lines.

"Policy V would prohibit new sewage lines which are allowed to be extended from passing through lands designated for agricultural use unless no other reasonable route is available. Policy VI provides that where sewer lines are required to be extended through agricultural lands that there will be a sewer assessment deferral for such lands. Finally, Policy VII states that the presence or absence of sewers and other public facilities should be balanced against other development concerns so that disproportionate emphasis is not given to public facilities in determining whether new development should be allowed."

[2] Policies III and VII were withdrawn from BCVSA's challenge before LUBA, and LUBA noted that the two policies, because they related "more to regulating or directing growth," were outside BCVSA's sphere of authority.

planning does not require a service district's plan to conform to the county's comprehensive plan, and we do not believe it is borne out in the statutory scheme.

The planning authority of sanitary districts derives in part from ORS 450.825,[3] promulgated in 1955. Also, under ORS 197.185,[4] promulgated in 1973, special districts (a category which under ORS 197.015(10) includes sanitary districts) have plan-making authority. The primary responsibility, however, for enacting comprehensive plans is assigned to cities and counties, both of which are *required* to enact comprehensive plans. ORS 197.175.[5] The city and county are the primary planning units in the land use scheme. *See* ORS 197.005(3)[6]; Statewide Planning Goal

---

[3] ORS 450.825 provides:

"As soon as practicable after the election of the first members of the board [of the sanitary authority], the board shall make a study and survey of the existing sewage disposal facilities and systems in the authority and of its sewage disposal needs, both present and future, and prepare an overall coordinated plan for the authority which incorporates, so far as practicable. existing sewage disposal and drainage systems, future sewage treatment plants, including connecting trunk and lateral sewers, and future drainage systems. Such plan shall be revised from time to time as circumstances may require. In preparing the plan or revisions thereto, the board shall take into consideration expected fluctuations in population and in business and industrial activity."

[4] ORS 197.185 provides in relevant part:

"(1) Special districts shall exercise their planning duties. powers and responsibilities and take actions that are authorized by law with respect to programs affecting land use, including the annexation of territory to a district pursuant to ORS 198.850 to 198.865, in accordance with state-wide planning goals approved pursuant to ORS 197.005 to 197.430 and 469.350."

[5] ORS 197.175 provides in relevant part:

"(2) Pursuant to ORS 197.005 to 197.430 and 469.350. each city and county in this state shall:

"(a) Prepare and adopt comprehensive plans consistent with state-wide planning goals approved by the commission; and

"(b) Enact zoning, subdivision and other ordinances or regulations to implement their comprehensive plans."

[6] ORS 197.005 provides in relevant part:

"(3) Except as otherwise provided in subsection (4) of this section. cities and counties should remain as the agencies to consider, promote and manage the local aspects of land conservation and development for the best interests of the people within their jurisdictions.

"(4) The promotion of coordinated state-wide land conservation and development requires the creation of a state-wide planning agency to prescribe

2.[7] A special district is directed to adopt "an overall coordinated plan" relating to sewage disposal and treatment, but such a plan is not as all-encompassing as a comprehensive plan defined in ORS 197.015(5),[8] which the city or county is required to adopt. It is evident that BCVSA's sewer plan, while designated by BCVSA as a comprehensive plan, is not comprehensive within the meaning of ORS 197.015(5), because it does not interrelate "all functional and natural systems and activities relating to the use of lands."

The policies adopted by the county relating to sewer services are, on their face, within the category of policies which the county is empowered to include within its comprehensive plan. ORS 197.015(5) (*supra*, n 8). The policies are general in that they are not made applicable to specific tracts of land but are couched in "broad categories." Although LUBA characterizes them as being "fairly specific," they do not approach a level of specificity inappropriate for comprehensive planning. Furthermore, the policies pertain to a matter required under ORS 197.015(5) and Goal 11

planning goals and objectives to be applied by state agencies, cities, counties and special districts throughout the state."

[7] Statewide Planning Goal 2 (land use planning), OAR 660-15-000 (Appendix A), provides in relevant part:

"City, county, state and federal agency and special district plans and actions related to land use shall be consistent with the comprehensive plans of cities and counties and regional plans adopted under ORS 197.705 through 197.795."

[8] ORS 197.015(5) provides:

"(5) 'Comprehensive plan' means a generalized, coordinated land use map and policy statement of the governing body of a state agency, city, county or special district that interrelates all functional and natural systems and activities relating to the use of lands, including but not limited to sewer and water systems, transportation systems, educational systems, recreational facilities, and natural resources and air and water quality management programs. 'Comprehensive' means all-inclusive, both in terms of the geographic agrea covered and functional and natural activities and systems occurring in the area covered by the plan. 'General nature' means a summary of policies and proposals in broad categories and does not necessarily indicate specific locations of any area, activity or use. A plan is 'coordinated' when the needs of all levels of governments, semipublic and private agencies and the citizens of Oregon have been considered and accommodated as much as possible. 'Land' includes water, both surface and subsurface, and the air."

(public facilities and services)[9] to be included in the comprehensive plan. Finally, no statutory provision has been cited to us, and we have found none, that limits the policy-making power of the county to matters relating "more to regulating or directing growth," a distinction made by LUBA in its order. ORS 197.015(5) defines a comprehensive plan as a "land use map and policy statement" which interrelates activities "relating to the use of lands," a broader concept than that of merely regulating growth.

Although both the sanitary district and the county appear to have statutory authority to formulate policy concerning sewer services, we conclude that the sanitary district's policy-making role is subordinate to that of the county, and that the county was within its statutory authority in adopting the policies in question. We reach that conclusion because ORS 197.185(1) specifically requires special districts to exercise their planning duties "in accordance with state-wide planning goals." So must counties. ORS 197.175. To avoid a standoff between planning agencies, Goal 2 (*supra,* n 7) requires that special district plans be consistent with the comprehensive plan of counties.

LUBA's rationale seems also to be predicated upon an asserted failure by the county to follow the proper procedure. According to LUBA, in the event of conflict over sewer policy between the district and the county, the county's exclusive remedy is to obtain an enforcement order

---

[9] Statewide Planning Goal 11, OAR 660-15-000 (Appendix A) provides in relevant part:

"Urban and rural development shall be guided and supported by types and levels of urban and rural public facilities and services appropriate for, but limited to, the needs and requirements of the urban, urbanizable and rural areas to be served. A provision for key facilities shall be included in each plan. To meet current and long-range needs, a provision for solid waste disposal sites, including sites for inert waste, shall be included in each plan.

"* * * * *

"Urban Facilities and Services — refers to key facilities and to appropriate types and levels of at least the following: police protection; fire protection; sanitary facilities; storm drainage facilities; planning, zoning and subdivision control; health services; recreation facilities and services; energy and communication services; and community governmental services."

from LCDC under ORS 197.320.[10] That may be the case after the county's plan has been acknowledged, but we do not accept the proposition that it is necessarily the county which must bring the matter before LCDC prior to the acknowledgment of its plan. Here, it is the district which is trying to invalidate part of what the county has adopted as its plan.

As LUBA notes, ORS 197.254(2)[11] provides that if a district fails to enter into or violates a cooperative agreement, it may not contest the county's acknowledgment request. The county, however, may not request acknowledgment unless it has adopted a complete comprehensive plan. Under Goal 11 (*supra,* n 9) and ORS 197.015(5) (*supra,* n 8), the plan must include a policy statement dealing with sewer services. In the situation contemplated in ORS 197.254(2), then, the county must formulate its *own* sewer policies, and the special district must coordinate its plan with that of the county. Not only does this imply the county's statutory authority to do so, but it also suggests by

---

[10] ORS 197.320 provides in relevant part:

"(1) The commission shall issue an order requiring a city, county, state agency or special district to take action necessary to bring its comprehensive plan or zoning, subdivision or other ordinance, regulation, plan or program into conformity with the state-wide planning goals if the commission has good cause to believe:

"(a) A comprehensive plan, or zoning, subdivision or other ordinance or regulation adopted by a city, county not on a compliance schedule is not in conformity with the state-wide planning goals by the date set in ORS 197.250 for such conformity; or

"(b) A plan, program or regulation affecting land use adopted by a state agency or special district is not in conformity with the state-wide planning goals by the date set in ORS 197.250 for such conformity; * * *"

[11] ORS 197.254(2) provides:

"(2) A special district shall be barred from contesting a request for compliance acknowledgment submitted by a city or county under ORS 197.251, if the city or county assigned coordinative functions under subsection (1) of ORS 197.190 finds that:

"(a) The special district has not entered into a cooperative agreement under ORS 197.185; or

"(b) The special district has not coordinated its plans, programs or regulations affecting land use with the comprehensive plan or implementing ordinances or regulations of the city or county pursuant to its cooperative agreement made under ORS 197.185."

implication that goal conflicts between districts and counties may be resolved at the acknowledgment phase when the district is *not* precluded from raising objections. Conceivably, both the county and district plans may be found by LCDC to comply with the statewide planning goals, and although we need not resolve that problem here, Goal 2 presumably would resolve it.

BCVSA argues that waiting until the acknowledgment stage to resolve the conflict involves too much delay. It has not, however, been demonstrated to us that the county's adoption of the general policies in question requires withdrawal of any existing services. As to planned expansion, BCVSA is in no worse position than any other public (or private) entity which has plans for development that depend upon a modification of the comprehensive plan, whether by amendment or as a result of the acknowledgment process.[12]

Whatever procedure is employed to obtain LCDC review, the fact remains that absent a goal violation by the county, the county has the final say on which planning policies to adopt in its comprehensive plan. Were the principle at stake to be otherwise, any special district could hold a county hostage in its comprehensive planning by refusing to agree to restrictions on its own plans for development and expansion. We do not think the legislature intended special districts to exercise that kind of leverage in land use planning. Moreover, policies adopted by one special district may tend to conflict with policies desired by another district with a different area of responsibility. The role of the county in its comprehensive planning is to accommodate the needs of all levels of government "as much as possible," ORS 197.015(5), and the purpose of Goal 2 is to give the county here primary responsibility for, and overriding authority with respect to, policy decisions necessary to adopt an effective comprehensive plan. We agree with the following analogy contained in the county's brief:

> "To permit a single purpose district with a limited focus to impose planning considerations upon the overall

---

[12] BCVSA has not sought amendment of the county comprehensive plan. Presumably, BCVSA may obtain LUBA/LCDC review of a denial of a requested amendment to the comprehensive plan.

comprehensive plan would frustrate the ability of the comprehensive plan to deal with all required elements. It is analogous to a city having responsibility for overall traffic flows, safety and environmental concerns and dealing with a transportation district running buses within the city. If the city wishes to impose a one-way traffic system, it would be 'coordination' when the city advises the district of the proposal, the timetable for changing to the system, and offers assistance to meet the problems of the district. If the district should assert it has the expertise and authority to meet the needs of the travelling public and cannot accept such restrictions, it can be clearly seen that the city with its overall responsibilities must have authority to specify how traffic will flow. The buses should not be allowed to go the wrong way."

Because LUBA expressly did not reach other assignments of error before it, some of which involve statewide goal[13] questions, we remand this case to LUBA for further proceedings consistent with this opinion.

Reversed and remanded.

---

[13] With respect to goal issues, LUBA is required by statute (Or Laws 1979, ch 772, § 6) to submit its recommendation as to disposition to LCDC. Under other circumstances we would remand the Goal 2 issue to LUBA in order that LCDC determine its applicability to a planning agency within a larger one. However, LCDC has already determined that goal's applicability under that situation. *City of Happy Valley v. Fujimoto,* LUBA No. 80-111, review pending in this court.