Argued and submitted August 4, reversed and remanded with instructions
September 7, petition for review denied December 27, 1994 (320 Or 493)

# BEAR CREEK VALLEY
# SANITARY AUTHORITY,
*Petitioner,*

*v.*

# CITY OF MEDFORD,
*Respondent.*

(LUBA 92-172)

# BEAR CREEK VALLEY
# SANITARY AUTHORITY,
*Petitioner,*

*v.*

# JACKSON COUNTY,
*Respondent.*

(LUBA 92-192; CA A84711)

880 P2d 486

Lee A. Mills argued the cause for petitioner. With him on the brief was Brophy, Mills, Schmor, Gerking & Brophy.

Eugene F. Hart, Jr., attorney for respondent City of Medford, argued the cause for respondents. With him on the brief was Arminda J. Brown, attorney for respondent Jackson County.

Before Richardson, Chief Judge, and Riggs and Haselton, Judges.

RICHARDSON, C. J.

## RICHARDSON, C. J.

Petitioner Bear Creek Valley Sanitary Authority (petitioner) is a district established under ORS chapter 450, which provides sewer services to property located in urbanizable, unincorporated areas that are inside the city of Medford's urban growth boundary. In 1992, the city and Jackson County adopted identical urbanization policies as part of their acknowledged comprehensive plans.[1] The policies provide, as relevant:

> "Within the unincorporated urbanizable area, execution and recording of an irrevocable consent to annexation to the City, pursuant to ORS 222.173, shall be required for:
>
> "* * * * *
>
> "B)  Sanitary sewer and water hook-up permits[.]"

The effect of the policies is to make a property owner's consent to *city* annexation a condition of receiving new services from *petitioner*.[2]

Petitioner appealed to LUBA from the enactment of the policies. It contended, as it does here, that ORS 222.115, which relates to property owners' consents to city annexations in exchange for receiving city services in unincorporated areas, does not authorize cities to require such consents as consideration for services provided by other governmental bodies, like petitioner.[3] ORS 222.115 provides:

> "A contract between a city and a landowner relating to extraterritorial provision of service and consent to eventual annexation of property of the landowner shall be recorded and, when recorded, shall be binding on all successors with an interest in that property."

---

[1] The policies were adopted before any arguably relevant 1993 state legislation took effect, and that legislation does not apply here. *See* Or Laws 1993, ch 804.

[2] The reason for the policies was succinctly explained by LUBA:

"Respondents' reason for adopting the above policy is relatively straightforward and is not really disputed by petitioner. The city provides essentially all urban services within the UGB [Urban Growth Boundary] other than sanitary sewer services. Persons living within the UGB who are able to obtain sanitary sewer service from petitioner and water from individual wells have little incentive to annex to the city to obtain and help pay for other urban services provided by the city."

[3] Petitioner also relies on ORS 222.173. It is unnecessary for us to address the effect of that statute separately or specifically.

LUBA noted its agreement that "nothing in ORS 222.115 or 222.173, or elsewhere in ORS chapter 222, grants the city and county authority to adopt" policies such as the ones in question. However, LUBA concluded that the city and county derive their authority for the enactment of the policies from their general planning responsibilities under ORS chapter 197 and from the statewide planning goals that ORS 197.175(2) requires their comprehensive plans to satisfy.

Having resolved the question of the city's and county's authority in that manner, LUBA turned back to ORS 222.115 and other provisions of ORS chapter 222, and concluded that those statutes do not *preempt* either the authority to adopt the policies or the substance of the policies. Although LUBA's analysis was responsive to the parties' arguments, the effect of its reasoning is somewhat curious: What began as a question of whether ORS 222.115 authorized the adoption of the policies, which LUBA answered negatively, was ultimately transformed into a question of whether that and related statutes forbade the adoption of the policies that LUBA had concluded were authorized by other statutes. LUBA's explanation for its answer to the preemption variation of the question was that "[w]e see no general legislative intent that state legislation in the area of consents to annexation be exclusive."

■     Petitioner seeks our review. It is important to define at the outset what we consider the issue *not* to be, before turning to what we think it *is*. We do not question LUBA's or the city's or county's point that annexations are germane to the planning process and, in some respects, are subject to the planning statutes and goals. *See* ORS 197.175(1); *Petersen v. Klamath Falls*, 279 Or 249, 566 P2d 1193 (1977). It is also not reasonably disputable that annexations are relevant to the process of urbanization and the development of urban-level services, or that those matters are planning concerns. *See* Goals 11 and 14. Finally, there is no doubt that, in most areas of the state, including the one in question, counties are the governmental bodies that are responsible for coordinating planning activity, and their planning decisions prevail over those of special districts within the county. *See former* ORS 197.190 (*since renumbered* ORS 195.025); *Jackson County v.*

*Bear Creek Authority*, 53 Or App 823, 632 P2d 1349 (1981), *aff'd* 293 Or 121, 645 P2d 532 (1982).

Suffice it to say that the county's planning authority is broad and could have some applications to the provision of urban services by petitioner or the city in unincorporated areas. Whether or not the *county* could make annexation to the city a condition of the provision of *city* services, the city itself could do that, as an exercise of its planning authority *and* of its authority under the annexation statutes. Indeed, that is precisely what ORS 222.115 contemplates.

■ The question, however, is not whether the city and county have planning authority that touches on annexation and the development and provision of urban services in *some* ways. It is not the law that *any* local legislative provision that has any nexus to the planning process or to planning decisions is necessarily authorized by or controlled by the planning statutes. Some matters are so tangentially related to land use planning, or so centrally related to other governmental operations or regulatory schemes, that they are beyond the regulatory ambit of the land use laws. For example, certain programs, *e.g.*, taxation, can clearly have effects on land use and planning, but their bearing on other governmental concerns is so much greater that it would be anomalous to subject them to the land use laws. As we said when so holding in *Housing Council v. City of Lake Oswego*, 48 Or App 525, 538, 617 P2d 655 (1980), *rev dismissed* 291 Or 878, 635 P2d 647 (1981), "the legislature created LCDC to be part of the state government, not to be the state government."

■ In this case, we reach essentially the same answer for a different reason. It is true, as we have noted, that annexation has planning aspects that are subject to the land use laws and goals. However, annexation also has a second aspect that is more a political than a planning concern and that is comprehensively regulated by other statutes, in this instance ORS 222.111 *et seq.* The line between the two parts of the process has been well-defined in *Petersen v. Klamath Falls, supra*, and in later cases, like *Stewart v. City of Corvallis*, 48 Or App 709, 617 P2d 921 (1980), *rev den* 290 Or 491 (1981), that have explained *Petersen*: The decision by a city or other governing body that *proposes* an annexation is an act of planning that must comply with the land use laws; however,

the subsequent acts that are necessary to *finally adopt or reject* the proposal, generally a popular vote under the ORS chapter 222 procedures, are not controlled by or subject to the land use laws. Rather, they are subject to the state statutes and complying local legislation that pertain to annexation procedures. *See also Heritage Enterprises v. City of Corvallis,* 71 Or App 581, 693 P2d 651, *aff'd* 300 Or 168, 708 P2d 601 (1985).

The exercise of obtaining consents to annexation in lieu of an election is part of those annexation procedures and is subject to the annexation statutes. The consent procedure is simply an alternative to a popular vote under the annexation statutes, ORS 222.170 *et seq*, and serves as a second mechanism by which final public action on a proposed annexation can occur. We agree with petitioner that ORS chapter 222 in general and ORS 222.115 in particular are the relevant statutory provisions.

■■ That does not end the inquiry, because the city and county do not share petitioner's understanding that any necessary authority for the plan policies is lacking in ORS 222.115. The city and county agree that the statute does not *expressly permit* them to require consents from those obtaining services from petitioner, as it does when the services are provided by the city itself. They contend, however, that the statute does not *expressly prohibit* them from requiring consents in this situation. They also argue that the legislative history of Oregon Laws 1991, chapter 637, section 4, through which ORS 222.115 was enacted, indicates that it was simply a legislative recognition of a practice that cities had long been following. Finally, the city and county posit that they need no express statutory authority because, in the absence of preemption, authority for specific local legislation can be implied from more general grants of authority.

If the text of ORS 222.115 were considered in a vacuum, the city's and county's view would be plausible. However, the context in Oregon Laws 1991, chapter 637, does not substantiate their understanding of the meaning and intended purpose of the statute. As noted earlier, ORS 222.115 was promulgated through section 4 of that Act. Section 2 of the Act, codified as ORS 198.869, contains an

identical provision regarding consents to annexations by *districts* in exchange for *their* provision of services outside their territory.[4] If sections 2 and 4 do not limit the imposition of a consent requirement to situations where the services are provided by the body that imposes it, their combined effect would be that districts and cities could require that they be given consents to annex one another's territory, based on the fact that the territory receives services from the body of which it is already a part.[5] The only logical way in which the two sections can be read together is that they allow consent to be required in consideration for services only by the body that provides the services.

■ Section 6 of the Act also illustrates that neither section 4 nor section 2 was perceived by the legislature as a mere legislative recognition of an existing practice, or as anything short of a conferral and definition of the authority to obtain consents under the circumstances delineated in the two sections.[6] Section 6 added the following language to ORS 199.487:

> "Notwithstanding ORS 199.490(2)(b), 222.173(1), 222.175 or any other requirement for obtaining consent to annexation, a city or district may use a consent to annexation contained in contracts *authorized by section 2 or 4* of this 1991 Act in formulating annexation proposals or petitions under ORS 198.855, 199.490(2), 222.125 or 222.170 for properties whose owners have signed such consents to annexation." (Emphasis supplied.)

In sum, reading ORS 222.115 in the context of the 1991 Act through which it was adopted, we interpret the statute to be the defining source of and limitation on city

---

[4] ORS 198.869 provides:

"A contract between a district and a landowner relating to extraterritorial provision of service and consent to eventual annexation of property of the landowner shall be recorded and, when recorded, shall be binding on all successors with an interest in that property."

[5] We do not address whether an *actual* annexation by the other body could occur while a district or city continues to provide services within its own territory, and the *other body remains only a* potential alternative future source of the services. The concern of sections 2 and 4, however, is with *present* consents to *eventual* annexations.

[6] The fact that a practice predates legislative action does not, of course, preclude the legislature from regulating it.

authority to obtain consents to annexation in exchange for extraterritorial services. We also interpret the statute to allow that procedure to be used by cities only when they are the providers of the services. The city's and the county's policies are in violation of the statute.

We need not reach the parties' other arguments.

Reversed and remanded with instructions to reverse city's and county's decisions.