Argued and submitted March 24, affirmed October 6, reconsideration denied November 13, petition for review allowed December 31, 1980

STATE HOUSING COUNCIL, et al,
*Petitioners-Cross-Respondents,*

*v.*

CITY OF LAKE OSWEGO,
*Respondent-Cross-Petitioner,*
LAND CONSERVATION AND DEVELOPMENT
COMMISSION, et al,
*Respondents.*

(No. 78-030, CA 15395)

617 P2d 655

Mark J. Greenfield, Portland, argued the cause for petitioners-cross-respondents State Housing Council and 1000 Friends of Oregon. With him on the briefs was Robert E. Stacey, Jr., Portland.

James M. Coleman, City Attorney, Lake Oswego, argued the cause and filed the briefs for respondent-cross-petitioner City of Lake Oswego.

Mary J. Deits, Assistant Attorney General, Salem, argued the cause for respondent Land Conservation and Development Commission and Department of Land Conservation and Development. With her on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Eleanore S. Baxendale, Assistant City Attorney, Beaverton, argued the cause and filed the brief for respondent City of Beaverton.

Greg Eades, City Attorney, Milwaukie, waived appearance for respondent City of Milwaukie.

Thomas Sponsler, City Attorney, Gresham, waived appearance for respondent City of Gresham.

Before Schwab, Chief Judge, and Joseph, Warden and Warren, Judges.

SCHWAB, C. J.

## SCHWAB, C. J.

The issue is the jurisdiction of the Land Conservation and Development Commission to review local government taxation and budget ordinances for compliance with the statewide planning goals. We hold that LCDC does not have such jurisdiction.

The State Housing Council initiated this proceeding before LCDC, contending that the City of Lake Oswego did not consider or comply with the statewide planning goals in adopting Ordinance No. 1706. That ordinance imposes a "system development charge" on all new construction in Lake Oswego. The Housing Council contended generally that Lake Oswego had failed to consider the statewide planning goals. The Housing Council argued more specifically that Ordinance No. 1706 is not supported by adequate findings in violation of Goal 2;[1] and that the systems development charge unreasonably increases housing costs in violation of Goal 10.[2]

Numerous parties intervened in the LCDC proceedings. 1000 Friends of Oregon, the Oregon State Homebuilders Association and the Homebuilders

---

[1] Goal 2 provides in part:

"All land use plans shall include identification of issues and problems, inventories and other *factual information* for each applicable statewide planning goal, evaluation of alternative courses of action and ultimate policy choices." (Emphasis supplied.)

In a case involving a local ordinance imposing a moratorium on construction, LCDC ruled that the factual information requirement must be satisfied by findings of fact. *1000 Friends, Randall Co. v. City of Beaverton,* LCDC opinion and Order no. 78-015 (October 30, 1978). The City of Lake Oswego here suggests that the factual information or findings requirement of Goal 2 is applicable only to comprehensive plans. That would appear to be inconsistent with LCDC's prior interpretation of the Goal, but we need not reach that question.

Inexplicably, LCDC here suggests "the enactment of Ordinance 1706 was a purely legislative act and no findings were required." That seems to be inconsistent with LCDC's prior decision. Again, however, we do not reach this aspect of this case.

[2] Goal 10 provides in part:

Association of Metropolitan Portland joined the State Housing Council in challenging Ordinance No. 1706.[3] The cities of Beaverton, Milwaukie and Gresham joined Lake Oswego in defending the ordinance.

The several issues raised by the various parties fall into two broad categories: (1) whether LCDC had jurisdiction to consider this challenge to the systems development charge; and if so (2) whether it complies with the statewide planning goals. LCDC's final order upheld Ordinance No. 1706, although it is not completely clear whether it was on the merits or on jurisdictional grounds. That order states:

> "* * * we conclude that *there is no substantial evidence* in the record that the Ordinance impacts the availability of housing nor makes such housing unaffordable to persons who would otherwise be in the market for housing in Lake Oswego. An ordinance resulting in increased housing costs does not necessarily, by that fact alone, violate the interests to be protected * * * by Goal 10. An ordinance increasing housing costs may significantly affect a shift in land use or discourage affordable housing, and would then constitute a land use action and require addressing the planning goals. There is, however, no such evidence in this case.
>
> "* * * * *
>
> "It is hereby ordered and declared that the enactment of Ordinance No. 1706, creating a systems

---

"* * * [P]lans shall encourage the availability of adequate numbers of housing units at price ranges and rent levels which are commensurate with the financial capabilities of Oregon households."

The parties seem to agree that the policy reflected in Goal 10 is to encourage the *availability* and *affordability* of housing.

[3] The City of Lake Oswego argues at length that the State Housing *Council* lacked standing to initiate this proceeding; that only the State Housing *Division* had standing. Even if that is correct, we fail to see what difference it makes because three other petitioners, whose standing is not challenged, intervened in the LCDC proceedings and advanced the same claims as the Housing Council.

development charge, *was not proven to be a land use action."* (Emphasis supplied.)[4]

We reach only the issue of LCDC's jurisdiction.

## I

This proceeding was brought pursuant to former ORS 197.300(1)(a) which provided that LCDC

"shall review * * * a comprehensive plan provision or any zoning, subdivision or other ordinance or regulation * * * that the [petitioner] considers to be in conflict with state-wide planning goals * * *."[5]

Read literally and in isolation, this statute implies that LCDC's review jurisdiction is invoked merely by an allegation that a local ordinance violates the statewide planning goals. However, when considered in context with the balance of ORS ch 197, we are certain that never was the intended meaning.

ORS 197.175(1) provides:

"Cities and counties shall exercise their planning and zoning responsibilities * * * in accordance with * * * the state-wide planning goals * * *."

ORS 197.180(1) imposes the same limit on state agencies:

"State agencies shall carry out their planning duties, powers and responsibilities and take actions that are authorized by law with respect to programs affecting land use in accordance with statewide planning goals approved pursuant to ORS 197.005 to 197.430 and 469.350."

ORS 197.185(1) imposes the same limit on special districts:

---

[4] "Substantial evidence" is usually referred to in deciding a matter on the merits, but LCDC ultimately declared that Ordinance No. 1706 was not a land use action, which is a jurisdictional holding. As explained more fully below, LCDC's real thesis appears to have been that the question of its jurisdiction had to be determined based on the evidence presented to the local government.

[5] Former ORS 197.300(1)(a) was repealed by Oregon Laws 1979, ch 772, § 26, and replaced by a new review procedure created by that session law — which is not codified, but is published at the beginning of ORS ch 197.

"Special districts shall exercise their planning duties, powers and responsibilities and take actions that are authorized by law with respect to programs affecting land use, including the annexation of territory to a district pursuant to ORS 198.850 to 198.865, in accordance with state-wide planning goals approved pursuant to ORS 197.005 to 197.430 and 469.350."

The wording varies slightly, but the concept is the same: all units of government must comply with the statewide planning goals when, but only when, exercising their land use planning responsibilities.

LCDC can only review actions of other units of government for compliance with the goals. Thus the concept "land use planning responsibilities" does two things: (1) it defines those actions of governmental units that must comply with the goals; and (2) it defines LCDC's review jurisdiction, *i.e.*, LCDC can only review for goal compliance in those situations where the goals had to be considered. Viewed against this background, an allegation of goal violation standing alone does not invoke LCDC review jurisdiction, notwithstanding the broad language of former ORS 197.300(1); LCDC can only review an exercise of land use planning responsibility.

Land use planning responsibility is not defined in ORS ch 197. The Supreme Court has interpreted that term as including annexation approvals, subdivision approvals and partition approvals. *Alexanderson v. Polk County,* 289 Or 427, 616 P2d 459 (1980); *Meeker v. Clatsop County,* 287 Or 665, 601 P2d 804 (1979); *Petersen v. Klamath Falls,* 279 Or 249, 566 P2d 1193 (1977). Those precedents are not especially helpful here, however, because of the fundamentally different nature of the systems development charge created by Ordinance No. 1706. It is a taxation ordinance providing a means of raising revenue and, to the extent that most of the revenue raised is earmarked for specific purposes, also a budget ordinance providing for expending revenue in the future.

## II

Ordinance No. 1706 imposes a "systems development charge" on all forms of development that are connected to city water or sewer facilities, such as creation of a trailer or mobile home park, and on all buildings erected after its enactment — industrial, commercial, residential and governmental, *e.g.,* schools. Despite the universal scope of the ordinance, the present dispute focuses only on its impact on future residential development.[6]

The systems development charge on residential development is not a single flat fee. Instead, it is computed by totaling six separate components, some of which are flat fees, some of which are based on rate schedules, and some of which are based on formulas. The "park system development fee," for example, is a flat fee: "$400 per single family residential unit and $380 per multiple residential unit." The "water systems development fee" is based on a schedule linked to the size of the water meter connected to the city water system; this fee ranges from a minimum of $550 for a 5/8 inch or 3/4 inch meter to $37,800 for a 12 inch water meter. The "storm sewer systems development fee" is based on a formula. Ordinance 1706 also contains an escalator clause that increases one of the components of the systems development charge by $25 annually.

It is thus not possible to state precisely what the dollar amount of the systems development charge typically will be. In April, 1979, LCDC's hearings officer hypothesized:

"For a new $60,000 single family house occupying 2,500 sq. ft. of a 10,000 sq. ft. parcel (including garage and driveway), the total cost of the [systems development] charge would be * * * $1,957 * * *. The charge for a $100,000 home would be $2,037.

"The [approximately] $2,000 charge to the developer results in a $2,600 increase to the consumer

---

[6] Presumably it would be for some other government agency, trade association or interest group to complain about the impact of the systems development charge on industrial and commercial development.

at the time of purchase as the result of an added $600 reflecting the developer's profit interest and over-head charges.* * * On the basis of an 80%, 29 year mortgage at 10 1/2 percent interest, the $2,600 trans-lates into an added monthly payment of $25 and $8,435 over the life of the mortgage."

There was also evidence that the systems development charge would increase the rental price of a "typical" Lake Oswego apartment by $15 to $20 per month. Before LCDC, the parties accepted the hearings of-ficer's estimates and computations.[7]

There was evidence that, for every $1,000 increase in the cost of a new home, about nine percent of the potential home-buying public is priced out of the housing market. There was other evidence that the effect of the Lake Oswego systems development charge would be to put the cost of homes in that community beyond the reach of 52,000 Oregon families who would otherwise be able to afford a home in Lake Oswego.

### III

It is clear to us that the systems development charge has impacts on land use — the provision of public facilities and services, and the availability and affordability of housing. It is also clear to us that the systems development charge is primarily a fiscal measure designed to raise and allocate public revenue.

The present problem, in broad context, in-volves the erosion of the distinction between regula-tion and taxation. It is part of history — some might say ancient history — that taxation was once intended solely to raise revenue for the government. Presently, however, and evidently increasingly, many taxation policies are intended to advance social interests that have little or nothing to do with the government raising or expending revenue. Taxes have been

---

[7] The hearings officer's calculations have become obsolete in the less than 20 months since he made them. The escalator clause in Ordinance 1706 has increased the systems development charge by $50. Construction

imposed to inhibit gambling. *See, United States v. Kahriger,* 345 US 22, 73 S Ct 510, 97 L Ed 754 (1953). Taxes have been imposed to restrict the interstate shipment of marihuana. *See, United States v. Sanchez,* 340 US 42, 71 S Ct 108, 95 L Ed 47 (1950). Taxes have been imposed to discourage dealing in firearms. *See, Sonzinsky v. United States,* 300 US 506, 57 S Ct 554, 81 L Ed 772 (1934).

Taxation policy frequently has land use implications. Some states have used tax exemptions as a way to attract new industry and expand industrial use. Some states have used tax exemptions to encourage rehabilitation of blighted urban centers. *See generally,* Delogu, *The Taxing Power as a Land Use Control Device,* 45 Denver L J 279 (1968); Zimmerman, *Tax Planning for Land Use Control,* 5 Urban Lawyer 639 (1973).

Oregon's taxation statutes contain a catalog of specific tax incentives for specific uses of land: a property tax exemption for alternative energy systems, ORS 307.175; the possibility of an exemption for inter-city, multiple-family housing, ORS 307.600 *et seq;* an exemption for gasohol production plants, ORS 307.705; special, favorable assessment rules for land in agricultural use, ORS 308.345, *et seq,* which is expressly stated to be "offered to encourage owners of rural lands to hold such lands in exclusive farm use zones," ORS 215.243(4); special, favorable assessment rules for open space lands, ORS 308.740 *et seq,* based on a policy "that assessment practices must be so designed as to permit the continued availability of open space lands," ORS 308.745; a variety of special, favorable assessment rules for timber land, ORS ch 321; an income tax credit for weatherization of a home,

---

costs have increased; one of the components of the systems development charge is tied to the price of a home. And most significantly, mortgage rates now generally exceed 12 percent and may not fall below that figure in the foreseeable future. Thus, under current conditions, the Lake Oswego systems development charge increases the "front end" cost of a new home by about $3,000 which becomes more than $10,000 over the life of a 29 year mortgage.

ORS 316.088; an income tax credit for reforestation of certain lands, ORS 316.094; an income tax credit for installation of pollution control facilities, ORS 316.097; and income tax credits for alternative energy devices and energy conservation facilities, ORS 316.116 and 316.140.

In the same vein, we note that there are several references to possible implementation of land use policy by way of fiscal action in the guidelines to the statewide planning goals. Guideline 6(A)(3) under Goal 2 (Land Use Planning) refers to a "capital improvement budget" as one way to implement a land use plan. Guideline B(1) under Goal 6 (Resource Quality) refers to "tax incentives and disincentives" as ways of promoting environmental interests. Guideline B(1) under Goal 8 (Recreation) invites consideration of "tax policies" in providing for recreational needs. Guideline B(1) under Goal 9 (The State's Economy) suggests promoting diversification and improvement of the economy by way of "tax incentives and disincentives." Three of the guidelines under Goal 10 (Housing) — A(3), B(2) and B(5) — refer to using "tax incentives and disincentives" as a method to implement that Goal. Guideline B(1) under Goal 11 (Public Facilities and Services) refers to implementation through capital improvement budgeting, and guideline B(5) under the same Goal again refers to "tax incentives and disincentives." Finally, guideline B(5) under Goal 14 (Urbanization) also refers to "tax incentives and disincentives."

Local taxation ordinances with land use implications were involved in *Jarvill v. City of Eugene,* 289 Or 157, 613 P2d 1 (1979), and *Multnomah Co. v. Mittleman,* 275 Or 545, 552 P2d 242 (1976).

In sum, it appears that many fiscal statutes and ordinances have an impact on land use. The impact can range from intended to unintended, direct to indirect, dramatic to inconsequential, but the reality is that taxation policy impacts land use.

## IV

The present problem, more specifically, is what was the legislature's intent when it constructed the present statewide land use planning program. Did it intend that units of government, school boards, cities, counties, etc., apply the statewide planning goals to their various taxation and budget decisions that might have some impact on land use? Stating the same question differently, did the legislature intend that LCDC be able to review, for goal compliance, the adoption and administration of local taxation and budget policy that might have impact on land use?

The possible answers are that the legislature intended: (1) *all* fiscal policy that might impact land use must comply with the statewide planning goals; (2) *some, but not all,* fiscal policy must comply with the goals; and (3) *no* fiscal policy need comply with the goals, regardless of the extent of its impact on land use.

LCDC apparently adopted the second alternative in this case. In our opinion, that is the least satisfactory of the three possible answers. The first flaw is the impossibility of drawing a clear line between those local fiscal ordinances that would have to comply with the goals and those that would not. The line LCDC drew in this case is: "An ordinance increasing housing costs may significantly affect a shift in land use or discourage affordable housing, and would then constitute a land use action and require addressing the planning goals." There are, of course, limits on how precise our language can be, but we find LCDC's formulation meaningless. What is a "significant shift in land use"? What is a "significant impact on the availability of affordable housing"? LCDC did not reject any of the calculations or evidence we have summarized above: that the systems development charge would add about $2,600 to the cost of a new home, which becomes about $8,500 over the life of a mortgage; that the systems development charge would add about $20 per month to the rent of a new apartment; that for every $1,000 increase in the price of

housing, about nine percent of the public is priced out of the market; and that the Lake Oswego systems development charge would price about 52,000 Oregon households out of that housing market. If those are not significant impacts on the availability of affordable housing, it is hard to imagine what would be — a point we make not to quarrel with LCDC's conclusion, but only to demonstrate how little utility a test like "significant impact" has in this context.

The second flaw in LCDC's apparent position that some, but not all, local fiscal ordinances must comply with the goals is LCDC's procedural approach to determining which side of the line any given ordinance is on. According to LCDC, this would usually be determined based on the *evidence presented at the hearing* before the local government's formal adoption of the fiscal policy in question. However, we do not know of any universal requirement that each and every unit of government must hold a public-participation type of hearing before it adopts every facet of fiscal policy. That is, we do not know of any such requirement that is externally imposed; we appreciate that it is often self-imposed. To illustrate, if a local government imposed a substantial fee on subdivision applications, or enacted a tax on recording real property transaction documents — fiscal decisions with land use overtones — we do not know of any state law that mandates a public-participation hearing.

Of course, if the local government's action is an exercise of its land use planning responsibility, statewide planning Goal 2 requires a hearing, which we assume for present purposes means a public-participation hearing. But if a local government's action is not an exercise of its land use planning responsibility, it is at least possible that no public-participation hearing would be required. How then does LCDC expect to be able to determine whether a local fiscal ordinance has a "significant impact" on land use from the evidence presented at the local

hearing when it is legally possible that no hearing be held?[8]

LCDC's procedure of relying on the evidence presented at a hearing to determine whether a local government is exercising land use planning responsibility thus produces the situation of having to hold a hearing to determine whether Goal 2 requires a hearing. What local governments obviously need instead is guidance beforehand about whether and when their fiscal policy constitutes an exercise of land use planning responsibility so they would know *whether* a hearing is required by Goal 2.

The ambiguity of the line drawn by LCDC ("significant impact") and unworkable procedure adopted by LCDC (determine impact from the evidence presented at a local hearing that might not be held) persuades us that a rule that some but not all local fiscal policy must comply with the goals cannot have been the legislative intent. That leaves the either/or question of whether the legislature intended *all* local fiscal policy or *no* local fiscal policy to comply with the goals.

We simply cannot imagine that the legislature intended that all local taxation, budget and fiscal policy had to comply with the statewide planning goals. A county might decide that it will or will not expend money to pave graveled roads. A city might adopt either a very modest or very grandiose budget for acquisition of park land and construction of parks. A city might set sewer and water rates relatively high or relatively low. A school district might adopt a barebones budget, or it might decide to build heated swimming pools and indoor tennis courts at all the schools. All of these decisions would affect land use interests

---

[8] Basing the decision of whether the statewide planning goals apply to a given matter on the evidence presented at a local hearing could produce another anomaly: two local governments could adopt identical ordinances but, based on different evidence having been presented in the separate hearings, LCDC might find that it did have jurisdiction to review one of the ordinances, but did not have jurisdiction to review the identical ordinance adopted elsewhere.

like transportation, recreation and the efficient provision of public services. All of these decisions could result in higher or lower fees and taxes, thereby increasing or decreasing the cost of housing. Yet if the legislature contemplated that all of these decisions are exercises of land use planning responsibility that must comply with the goals, there is little or no local government action that is not land use planning.

Moreover, if the adoption of fiscal policy were subject to the goals, then the administration of that policy would likewise have to comply with the goals. That would produce the possibility of an appeal to LCDC of a county assessor's denial of a property owner's request for a farm-deferral property tax assessment rate. That would produce the possibility of an appeal to LCDC of the Department of Revenue's denial of a corporation's claim of an income tax credit for a pollution control device. We think the legislature created LCDC to be part of the state government, not to be the state government.

Having rejected as substantively and procedurally unmanageable any attempt to say that some but not all fiscal policy must comply with the goals, and having rejected as inconceivable the notion that the legislature intended that all fiscal policy had to comply with the goals, the only remaining possibility is that no local taxation or budget ordinance has to comply with the goals. We so hold.

There may, of course, be exceptions. For example, Goal 1 requires local governments to adequately finance a program for citizen involvement in land use planning. LCDC may have authority to review or to require fiscal policy in this area. *Cf. Gleason et al v. Thornton,* 210 Or 666, 313 P2d 776 (1957); *School District No. 4 v. Bayly et al,* 192 Or 548, 235 P2d 911 (1951). Moreover, we are here dealing with only direct review of a single ordinance. Whether LCDC can review some fiscal policy during the acknowledgment process involving review of the comprehensive plan and all implementing ordinances may present a different question.

We are aware that, as the cliche goes, the power to tax is the power to destroy. So we are also aware that our holding creates the possibility of a local government following a fiscal policy that impairs or destroys a state-mandated land use policy. That only documents, we believe, that there is no perfect answer in this case; that all of the alternatives can produce undesirable consequences. We conclude that the alternative we have decided was most likely legislatively intended produces the least undesirable consequences.

Affirmed.