# WESTSIDE NEIGHBORHOOD QUALITY PROJECT, INC. et al,

*Petitioners - Cross-Respondents,*

*v.*

# SCHOOL DISTRICT 4J BOARD OF DIRECTORS,

*Respondent - Cross-Petitioner.*

## (No. 81-096, CA A23957)

647 P2d 962

Bill Kloos, Eugene, argued the cause for petitioners cross-respondents. With him on the briefs were H. Thomas Andersen and Allen L. Johnson, Eugene.

Edward J. Sullivan, Portland, argued the cause for respondent - cross-petitioner. On the briefs were Corinne C Sherton, Salem, and O'Donnell, Sullivan & Ramis, Portland.

Before Richardson, Presiding Judge, and Thornton and Van Hoomissen, Judges.

RICHARDSON, P. J.

## RICHARDSON, P. J.

Petitioners appeal the order of the Land Use Board of Appeals (LUBA) affirming Eugene School District 4J's decision to close Lincoln Community School. The district cross-appeals from LUBA's determination that the district's action was a "land use decision" and was therefore reviewable by LUBA. We agree with the district that LUBA lacked jurisdiction.

The district board voted to close the school on August 5, 1981. The decision was made following public hearings and was based on extensive findings. The principal reasons for the decision were fiscal, including anticipated substantial expenses of bringing the school facility into conformity with safety standards. The district also concluded, among other things, that continued operation of the school would have a negative impact on district-wide staffing policy, that there were existing nearby schools for the Lincoln students and that closure of the school would have no long-term adverse effects on the community. The district made findings to the effect that the closure decision did not violate the statewide land use planning goals. Finally, the district made findings pertaining to certain policies under the Eugene-Springfield Metropolitan Area General Plan (MAGP) and the implementing Eugene Westside Neighborhood Plan (WNP).[1] WNP contains the policy that the city is to

> "[m]aintain Lincoln Community School, in cooperation with School District 4J, as the educational, social, recreational and community center of the Westside Neighborhood, by strengthening both the physical facility and programs provided there."

The district found:

> "Opponents of the closure of Lincoln School have argued that this policy prevents us from closing Lincoln School. We do not agree. This policy is not directed to District 4J, but rather to *the City* — telling it to do what *it* can to maintain Lincoln School 'in cooperation with School District 4J.' The policy should not and cannot be interpreted as an attempt by the City to usurp the statutory

---

[1] In effect, MAGP and WNP constitute the comprehensive plan for the area in which the school facility is located.

authority of the school district over educational programs. Given the fact that we had to close the school for educational and safety reasons, this policy can be interpreted to require the City to make *every* effort to negotiate with us an agreement for it to use the building as a community center." (Emphasis in original.)

Underlying the district's closure decision and the city's interest in maintaining the school as an educational facility is the fact that the school is a central-city institution. The student population in the area has declined over the years, while the city's concern with revitalizing the downtown area has increased. *See Jarvill v. City of Eugene,* 289 Or 157, 613 P2d 1, *cert den* 449 US 1013 (1980).

The threshold and decisive question in this case is whether the closure decision is a "land use decision" within the meaning of ORS 197.015(10) and is therefore reviewable by LUBA under Oregon Laws 1979, chapter 772, section 4(1), as amended by Oregon Laws 1981, chapter 748.[2] LUBA answered the question affirmatively. It reasoned that ORS 197.185(1)[3] requires special districts, like school

---

[2] ORS 197.015(10) provides:

" 'Land use decision' means:

"(a) A final decision or determination made by a local government or special district that concerns the adoption, amendment or application of:

"(A) The goals;

"(B) A comprehensive plan provision; or

"(C) A land use regulation; or

"(b) A final decision or determination of a state agency other than the commission with respect to which the agency is required to apply the goals."

Section 4(1) of the LUBA Act provides:

"(1) Review of land use decisions under sections 4 to 6, chapter 772, Oregon Laws 1979, shall be commenced by filing a notice of intent to appeal with the Land Use Board of Appeals. Subject to the provisions of section 6a, chapter 772, Oregon Laws 1979, relating to judicial review by the Court of Appeals and except as otherwise provided in section 3 of this 1981 Act [ORS 197.605], the board shall have *exclusive jurisdiction to review any* land use decision of a local government or special district governing body or a state agency in the manner provided in sections 5 and 6, chapter 772, Oregon Laws 1979."

[3] ORS 197.185(1) provides:

"Special districts shall exercise their planning duties, powers and responsibilities and take actions that are authorized by law with respect to programs

districts, to apply the statewide goals and, through Goal 2, relevant comprehensive plans in exercising planning functions or in taking action with respect to programs affecting land use. LUBA relied by analogy on the Supreme Court's statement in *Petersen v. Klamath Falls,* 279 Or 249, 253-54, 566 P2d 1193 (1977), that ORS 197.175(1) applies to "local planning activities which will have a significant impact on present or future land uses." LUBA then stated:

> "We conclude the decision of the district to close Lincoln School for elementary education purposes is a land use decision over which this board has review jurisdiction. The MAGP and the WNP contain policies which specifically address Lincoln and its importance to the downtown Eugene area and the west Eugene neighborhood of which it is a part. The district does not contend that the MAGP and the WNP policies pertaining to schools in general or Lincoln in particular are not valid or were outside the authority of the City of Eugene to adopt. At most, the district's position is that it simply was not required to consider the policies of the MAGP and WNP in arriving at its closure decision."

LUBA also relied on this court's opinion in *Jackson County v. Bear Creek Authority,* 53 Or App 823, 632 P2d 1349 (1981) (which the Supreme Court affirmed while the present appeal was pending, 293 Or 121, 645 P2d 532 (1982)). LUBA understood us to have held in *Bear Creek* that the "plan making authority" of a special district is "secondary and subservient to that of a county [or a city]." After analogizing the issue before it to our analysis in *Bear Creek* of the relative policy and planning authority of the county and the sanitary district, LUBA stated:

> "Policies with respect to the provision of school services are also, on their face, within the power of cities to adopt. ORS 197.015(5) defines a comprehensive plan as the map and policy statement 'that interrelates all functional and natural systems and activities relating to the use of lands, including but not limited to sewer and water systems. . . educational systems, . . .' Goal 11 also requires cities 'to

---

affecting land use, including a city or special district boundary change as defined in ORS 197.175(1), in accordance with goals approved pursuant to ORS 197.005 to 197.430 and 197.605 to 197.650."

plan and develop a timely, orderly and efficient arrangement of public facilities and services to serve as a framework for urban and rural development.' The goal defines 'timely, orderly and efficient arrangement' as 'a system or plan that *coordinates the type, location and delivery* of public facilities and services in a manner that best supports the existing and proposed land uses.' 'Urban facilities and services' as used in Goal 11 'refers to key facilities' which are, in turn, defined to include 'public schools.'" (Emphasis LUBA's.)

Finally, LUBA reject₣ the district's arguments based on *Housing Council v. City of Lake Oswego,* 48 Or App 525, 617 P2d 655 (1980), *petition for review dismissed,* 291 Or 878, 635 P2d 647 (1981). We stated in *Housing Council* that, notwithstanding the potential impact of local fiscal measures on land use,

"[w]e simply cannot imagine that the legislature intended that all local taxation, budget and fiscal policy had to comply with the statewide planning goals. A county might decide that it will or will not expend money to pave graveled roads. A city might adopt either a very modest or very grandiose budget for acquisition of park land and construction of parks. A city might set sewer and water rates relatively high or relatively low. A school district might adopt a barebones budget, or it might decide to build heated swimming pools and indoor tennis courts at all the schools. All of these decisions would affect land use interests like transportation, recreation and the efficient provision of public services. All of these decisions could result in higher or lower fees and taxes, thereby increasing or decreasing the cost of housing. Yet if the legislature contemplated that all of these decisions are exercises of land use planning responsibility that must comply with the goals, there is little or no local government action that is not land use planning.
"* * * * *

"Having rejected as substantively and procedurally unmanageable any attempt to say that some but not all fiscal policy must comply with the goals and having rejected as inconceivable the notion that the legislature intended that all fiscal policy had to comply with the goals, the only remaining possibility is that no local taxation or budget ordinance has to comply with the goals. We so hold." 48 Or App at 537-38.

LUBA concluded here:

> "We do not believe the decision to close Lincoln was a 'fiscal policy' decision which is exempt from application of statewide goals and local land use planning considerations within the meaning of *State Housing Council v. City of Lake Oswego,* 48 Or App 525, 617 P2d 655 (1980), *[petition for review dismissed,* 291 Or 878, 635 P2d 647 (1981)]. The district's decision here did not involve the adoption of fiscal policy; rather fiscal policy was simply the expressed motivation for the decision. Motivation is not, we submit, a yardstick by which can be measured whether a particular decision must comply with statewide goals and local comprehensive plans. To do so would, as petitioners point out, enable local governing bodies to insulate themselves from having to comply with land use planning requirements simply by expressing that the reason for the decision is to save money or to increase revenues. * * *"

In our view, the arguments LUBA and petitioners predicate on *Petersen* and *Bear Creek* beg the question. We stated in *Housing Council,* after quoting relevant portions of ORS 197.175(1), 197.180(1) and 197.185(1):

> "The wording varies slightly, but the concept is the same: all units of government must comply with the statewide planning goals when, but only when, exercising their land use planning responsibilities.

> "LCDC can only review actions of other units of government for compliance with the goals. Thus the concept 'land use planning responsibilities' does two things: (1) it defines those actions of governmental units that must comply with the goals; and (2) it defines LCDC's review jurisdiction, *i.e.,* LCDC can only review for goal compliance in those situations where the goals had to be considered. Viewed against this background, an allegation of goal violation standing alone does not invoke LCDC review jurisdiction, notwithstanding the broad language of former ORS 197.300(1); LCDC can only review an exercise of land use planning responsibility." 48 Or App at 530.

*See also Jackson County v. Bear Creek Authority,* 293 O 121, 124, 128, 645 P2d 532 (1982); *Housing Council v. Cit of Lake Oswego, supra,* 291 Or at 885; *Petersen v. Klamat Falls, supra,* 279 Or at 253-54. *Petersen* and *Bear Creek* ca be relevant here only if the district's action was an exerci of "land use planning responsibilities"; nothing in tho

cases assists in answering *whether* the district's action was an exercise of such responsibilities.

LUBA's rationale for concluding that the jurisdictional issue in this case is not controlled by *Housing Council* was that the decision here "did not involve the adoption of fiscal policy; rather fiscal policy was simply the expressed motivation for the decision." LUBA's understanding of the scope of our *holding* in *Housing Council* may or may not be correct. However, the broad principle we recognized in that case is that many kinds of governmental actions can have an *impact* on land use, but that fact does not make every governmental action a land use action. Our premise in *Housing Council* was that the legislature did not intend, through the statutory scheme then applicable to review of land use decisions, that the Land Conservation and Development Commission (LCDC) has authority to invalidate exercises of basic non-planning responsibilities by other governmental bodies, even though the exercise of such responsibilities can have substantial secondary effects on land use. As we stated in *Housing Council:* "We think the legislature created LCDC to be part of the state government, not to be the state government." 48 Or App at 538.[4]

We conclude that the district's decision in this case falls outside LUBA's jurisdiction for substantially the same reasons we concluded in *Housing Council* that taxation and budgetary actions are not reviewable by LCDC. The district board's decision was *only* that Lincoln School would cease to be operated by the district as a school. That decision was an exercise of the school board's responsibility for educational policy and basic district management. Whatever secondary effects the closure of the school might have on land use, the closure decision was not a "land use decision."

---

[4] The *specific* question in *Housing Council v. City of Lake Oswego,* 48 Or App 25, 617 P2d 655 (1980), was whether the city's fiscal action was subject to LCDC review for *goal compliance.* Because of intervening legislative changes in the land use review scheme, the specific question here is whether the closure decision is reviewable by LUBA as a *land use decision.* The reasoning in *Housing Council* is nonetheless applicable here. In our view, nothing in the more recent legislation relating to the land use review process alters the basic conclusion in *Housing Council* that that process was not legislatively intended to apply to all governmental actions that have tangential land use effects. *But see Housing Council v. City of Lake Oswego,* 291 Or 878, 635 P2d 647 (1981).

It is correct, as LUBA notes, that the definition of "comprehensive plan" in ORS 197.015(5) includes "educational facilities" as one of the "functional and natural systems and activities relating to the use of lands" that must be "interrelated" in a plan. We do not find that bare reference in the statutory definition to be inconsistent with the conclusion we have stated. The precise meaning of the requirement that a city take "educational facilities" into account in its comprehensive plan has not been legislatively or judically explained, and we need not explain it now, except to say that it does not mean that other governmental bodies may control or review the decision by a school district to close a school.

Reversed and remanded with instructions to dismiss the petition.