Argued and submitted November 23, 2005, affirmed February 15, 2006

HOME BUILDERS ASSOCIATION OF LANE COUNTY
and Home Builders Construction Company,
*Petitioners,*

*v.*

CITY OF SPRINGFIELD,
City of Eugene, Lane County and
Metropolitan Wastewater Management Commission,
*Respondents.*

2004-090, 2004-105, 2004-114; A129928

129 P3d 713

Bill Kloos argued the cause for petitioners. With him on
the brief was the Law Office of Bill Kloos, PC.

Meg Kieran argued the cause for respondents. With her on the joint brief were Leahy & Kieran and Stephen Vorhes and G. David Jewett and Thorp Purdy Jewett Urness Wilkinson, P.C. and Jerome Lidz and Harrang Long Gary Rudnick, P.C.

Andrew H. Stamp filed the brief *amicus curiae* for Home Builders Association of Marion Polk Counties and Oregon Home Builders Association.

Before Edmonds, Presiding Judge, and Brewer, Chief Judge, and Wollheim, Judge.

BREWER, C. J.

### BREWER, C. J.

Petitioners Home Builders Association of Lane County and Home Builders Construction Company seek review of a Land Use Board of Appeals (LUBA) order that dismissed for lack of jurisdiction their challenge to respondents' adoption of a public wastewater treatment facility plan (the "public facilities plan" or "the plan"). We affirm.

The public facilities plan was prepared by respondent Metropolitan Wastewater Management Commission ("MWMC" or "the commission"). By intergovernmental agreement, the other respondents, the cities of Eugene and Springfield and Lane County, created the commission. The plan, adopted in 2004, lists proposed improvements to the regional wastewater treatment system that serves the Eugene-Springfield urban area. LUBA described the MWMC and the genesis of the plan as follows:

"The MWMC is an intergovernmental entity created in 1977 by an intergovernmental agreement among Springfield, Eugene and Lane County. MWMC owns and operates the Eugene-Springfield regional wastewater treatment facility designed to serve those areas within the urban growth boundary. At the time of its inception, MWMC's facilities planning document was the '208 Plan.' The 208 Plan established the original projections, requirements and projects needed to serve the Eugene-Springfield community through 2005. The [public facilities plan] is driven by: the conditions contained in MWMC's NPDES[1] wastewater discharge permit; [The Department of Environmental Quality's] May 2002 reissuance of the NPDES permit and new regulations or changes in regulatory policy that affect overall treatment capacity rating, treatment strategy, or effluent requirements; current constraints; future capacity and performance requirements; new treatment technologies; and existing operational issues.

"Following the opening of MWMC's Water Pollution Control Facility (WPCF) in 1984, and prior to 1997, no comprehensive evaluation of the wastewater treatment facility

---

[1] NPDES is the National Pollution Discharge Elimination System. *See Oregon Research v. Pacific Coast Seafoods Co.*, 341 F Supp 2d 1170 (D Or 2004), for a discussion of this state's administration of this permit system.

was performed. Beginning in the mid-1990s, MWMC initiated several studies and projects to develop a master plan. In early 2003, MWMC began a planning process intended to produce a long range facility planning document and project list and a methodology for financing the projects. The [public facilities plan], which is the result of that study and analysis, is intended to identify facility enhancements and expansions that are needed to serve the community's regional wastewater needs through 2025. The planning criteria include *regulatory requirements, existing MWMC policies,* adopted citizen advisory committee recommendations and direct Commission guidance. MWMC adopted [the plan] and 20-year project list * * * on May 6, 2004."

*Home Builders Assoc. of Lane Co. v. City of Springfield,* 50 Or LUBA 109, 113-14 (footnote, citations, and internal quotation marks omitted). Respondents each separately adopted the plan.

This case involves a challenge to various improvements listed in the plan and their attendant cost. The improvements listed in the plan will cost approximately $144 million, and some of that cost will be paid by system development charges (SDCs).[2] Before LUBA, petitioners opposed improvement projects that are included in the plan that will expand treatment capacity at the MWMC regional wastewater treatment facility. Petitioners expressed a preference for different improvement projects that would reduce the amount of effluent that must be treated by reducing collection system inflow and infiltration. In addition, petitioners objected to the plan on the ground that the improvements proposed in the plan will require the collection of more revenue through SDCs than the improvements favored by petitioners. Petitioners also objected to the methodology used by respondents to assess and collect SDCs.

---

[2] ORS 223.299(4)(a) defines a "system development charge" as

"a reimbursement fee, an improvement fee or a combination thereof assessed or collected at the time of increased usage of a capital improvement or issuance of a development permit, building permit or connection to the capital improvement. 'System development charge' includes that portion of a sewer or water system connection charge that is greater than the amount necessary to reimburse the local government for its average cost of inspecting and installing connections with water and sewer facilities."

Respondents asked LUBA to dismiss this case on the ground that the elements of the plan to which petitioners object do not involve land use decisions subject to LUBA's review under ORS 197.825. LUBA observed that the plan appeared to include the elements required by Statewide Land Use Planning Goal 11, the Public Facilities and Services goal, and to constitute a public facilities plan envisioned by Goal 11 and its implementing rules.[3] LUBA characterized the question before it as whether the adoption of the elements of the plan that petitioners challenge constituted a land use decision that had to be adopted in accordance with land use decision-making procedures and in compliance with Goal 11 and its implementing rules.

LUBA granted respondents' motion and dismissed the case for lack of jurisdiction. LUBA stated that execution of the public facilities plan necessarily will trigger the application of Goal 11 and its implementing rules. LUBA also noted that the comprehensive plan amendments required to carry out the plan are land use decisions under ORS 197.015(10)(a)(A). However, LUBA ultimately concluded that the adoption of the particular elements of the plan that

---

[3] Goal 11 requires land use planning jurisdictions to "plan and develop a timely, orderly and efficient arrangement of public facilities and services to serve as a framework for urban and rural development [OAR 660-015-0000(11)]." The goal includes definitions, one of which defines "public facilities plan" as

"a support document or documents to a comprehensive plan. The facility plan describes the water, sewer and transportation facilities which are to support the land uses designated in the appropriate acknowledged comprehensive plan or plans within an urban growth boundary containing a population greater than 2,500."

OAR 660-011-0000 to 660-011-0065 implement Goal 11. OAR 660-011-0005(1) defines "public facilities plan" identically to the definition in Goal 11. OAR 660-011-0010(1) sets out the required elements of a Goal 11 public facilities plan. In summary, those elements include (a) an inventory and assessment of significant public facility systems supporting land uses designated in the acknowledged comprehensive plan; (b) a list of the significant public facility projects that will support land uses designated in the acknowledged comprehensive plan; (c) rough cost estimates for each public facility project; (d) a map or written description of the general location or service area of each public facility project; (e) identification of the provider of each public facility system; (f) an estimate of when each facility project will be needed; and (g) a discussion of the provider's funding mechanisms and the capacity of those and possible new mechanisms to fund the development of each public facility project or system.

petitioners were challenging did not involve a land use decision.[4]

■ Respondents initially assert that petitioners lack constitutional standing to challenge LUBA's decision on review because the record does not demonstrate that the decision has had or will have a practical effect on petitioners' interests. *See Utsey v. Coos County*, 176 Or App 524, 543, 32 P3d 933 (2001), *rev dismissed as moot*, 335 Or 217 (2003) (the party invoking the jurisdiction of the court, rather than the one responding to a petition for judicial review, must establish that a decision will have a practical effect on him or her). In support of their claim of standing, petitioners submitted an affidavit in which they assert that the challenged decisions will have a practical effect on them as homebuilders, because the SDCs contemplated by the plan will trigger higher costs for home construction.

Respondents argue that the practical effects on which petitioners rely are not the subject of this case. Respondents observe that the only issue presented on review is whether their adoption of the challenged elements of the plan constituted a land use decision that is reviewable by LUBA. The validity of the SDC methodology and charges, respondents note, are the subject of yet another appeal before this court, in which petitioners appeal a trial court judgment that denied a writ of review whereby petitioners challenged the SDC methodology adopted in the plan. *See Home Builders Assoc. of Lane Co. v. City of Springfield* (A129475; A129476; appeals from Lane County Circuit Court Case No. 14-04-15534). According to respondents, the practical effect on which petitioners rely in this case will arise only from the disposition of the appeal from the trial court judgment in the writ of review case. We disagree.

---

[4] The order on review is one of two companion LUBA decisions involving proposed improvements to the MWMC wastewater treatment system. In the companion case, which is not on review, petitioners challenged amendments to the Eugene-Springfield Public Facilities and Services Plan (PFSP) and the Eugene-Springfield Metropolitan Area General Plan (Metro Plan). Those amendments were adopted to comply with Goal 11 and to make those plans consistent with the public facilities plan. *Home Builders Assoc. of Lane Co. v. City of Springfield*, 50 Or LUBA 134 (2005).

If petitioners were to prevail on review in this case, LUBA would have to determine on remand whether respondents' adoption of the SDC methodology and the other challenged elements of the plan are consistent with the legal requirements of a land use decision. If LUBA were to decide that issue in petitioners' favor, they would have successfully impeded the challenged improvements and SDC methodology on a different ground than is presented in the writ of review appeal. The existence of multiple possible remedies for achieving a desired legal result does not mean that obtaining any particular one of those remedies would not have a practical effect on the proponent's interests. We conclude that petitioners have constitutional standing to seek review of LUBA's decision in this case.

■    We turn then to the question whether LUBA properly concluded that it lacked jurisdiction in this case. As noted above, petitioners have challenged particular elements of the public facilities plan. They argued before LUBA and reassert on review that the adoption of a list of planned public capital improvements and the adoption of a financing methodology for the improvements without conforming those decisions to applicable land use planning requirements "takes the 'planning' out of land use planning" and is "contrary to the Statewide Planning Goals." Thus, the issue before us is whether the adoption of a list of planned public capital improvements and the adoption of the financing methodology for those improvements constitute "land use decisions" that are reviewable by LUBA.[5]

ORS chapter 223 authorizes local governments to undertake capital improvements and provides for the use of SDCs as a mechanism to fund such improvements. ORS 223.297 provides that the purpose of ORS 223.297 to 223.314

---

[5] ORS 197.825 authorizes LUBA to review "land use decisions." A "land use decision" is defined in ORS 197.015(10)(a)(A) as:

"A final decision or determination made by a local government or special district that concerns the adoption, amendment or application of:

"(i)    The goals;

"(ii)   A comprehensive plan provision;

"(iii)  A land use regulation; or

"(iv)   A new land use regulation[.]"

is to "provide a uniform framework for the imposition of system development charges by local governments, to provide equitable funding for orderly growth and development in Oregon's communities and to establish that the charges may be used only for capital improvements." Specifically, ORS 223.309(1) authorizes adoption of a capital improvement plan, public facilities plan, master plan, or comparable plan that includes a list of the capital improvements that may be funded with improvement fee revenues and the estimated cost and timing for each improvement. ORS 223.309(2) provides for modification of such a plan or list. Further, and most significant for purposes of our analysis, ORS 223.314 provides that the "establishment, modification or implementation of a system development charge, or a plan or list adopted pursuant to ORS 223.309, or any modification of a plan or list, *is not a land use decision pursuant to ORS chapters 195 and 197.*" (Emphasis added.)

The adoption of a public facilities plan is also addressed in ORS chapter 197. ORS 197.712 provides, in part:

"(2)    By the adoption of new goals or rules, or the application, interpretation or amendment of existing goals or rules, the Land Conservation and Development Commission shall implement all of the following:

"* * * * *

"(e)    A city or county shall develop and adopt a public facility plan for areas within an urban growth boundary containing a population greater than 2,500 persons. The public facility plan shall include rough cost estimates for public projects needed to provide sewer, water and transportation for the land uses contemplated in the comprehensive plan and land use regulations. *Project timing and financing provisions of public facility plans shall not be considered land use decisions.*"[6]

(Emphasis added.)

---

[6] Consistently with that statute, a Goal 11 implementing rule, OAR 660-011-0005(8), provides that, "[i]n accordance with ORS 197.712(2)(e), project timing and financing provisions of public facility plans shall not be considered land use decisions as specified under ORS 197.015(10)."

The plain text of ORS 223.314 and ORS 197.712(2)(e) compel our conclusion that the matters before LUBA were not "land use decisions." The public facilities plan is a "public facilities plan" within the meaning of ORS 223.309; among the elements of the plan are a list of capital improvements that may be funded with improvement fee revenues as well as the estimated cost and timing for each improvement.[7] With respect to those elements, the adoption of the plan was not a land use decision pursuant to ORS chapter 197. ORS 223.314. Moreover, the plan provisions pertaining to project timing and financing, including the provisions involving system development charges, were not land use decisions. ORS 197.712(2)(e). Because petitioners challenge only elements of the public facilities plan that are not land use decisions under ORS 223.314 and ORS 197.712(2)(e), LUBA did not err in dismissing this case for lack of jurisdiction.[8]

Respondents concede that the Eugene-Springfield Metropolitan Area General Plan (Metro Plan) and the Eugene-Springfield Public Facilities and Services Plan

---

[7] ORS 197.505 provides, in part:

"As used in ORS 197.505 to 197.540:

"(1) 'Public facilities' means those public facilities for which a public facilities plan is required under ORS 197.712."

The term "public facilities plan" is not defined by statute; ORS 223.309 and ORS 197.712(2)(e) merely describe certain elements that are included in such a plan. However, as noted, the term is defined in Goal 11 and its implementing rules. *See* 204 Or App at 274 n 3.

[8] Although our conclusion is driven by the text of the controlling statutes, we note that it is also consistent with case law predating the enactment of those statutes. *See Westside Neighborhood v. School Dist. 4J*, 58 Or App 154, 161-62, 647 P2d 962, *rev den*, 294 Or 78 (1982) (reversing a LUBA determination that the closure of a school was a land use decision because it had a significant impact on present or future land uses). In *Westside Neighborhood*, we explained:

"[M]any kinds of governmental actions can have an *impact* on land use, but that fact does not make every governmental action a land use action. Our premise in [*Housing Council v. City of Lake Oswego*, 48 Or App 525, 617 P2d 655 (1980), *rev dismissed*, 291 Or 878 (1981),] was that the legislature did not intend, through the statutory scheme then applicable to review of land use decisions, that the Land Conservation and Development Commission (LCDC) has authority to invalidate exercises of basic nonplanning responsibilities by other governmental bodies, even though the exercise of such responsibilities can have substantial secondary effects on land use."

*Id.* at 161 (emphasis in original).

(PFSP) must be amended to make them consistent with the public facilities plan before the improvements recommended in the public facilities plan can be *built*.[9] Respondents also acknowledge that the Metro Plan and PFSP amendments must ultimately be consistent with the requirements of Goal 11 and its implementing rules, notwithstanding that the public facilities plan was adopted first to allow respondents to proceed with the adoption of a system development charge plan and to comply with applicable environmental regulations. Respondents' decisions to pursue separate, contemporaneous, processes to establish a public facilities plan in compliance with ORS 223.309 and to adopt amendments to the Metro Plan and PFSP to fulfill their land use planning obligations carry the risk that respondents will not be able to build the improvements listed in the public facilities plan. However, although it may have been more logical to combine those planning processes or to adopt the Metro Plan and PFSP amendments first, respondents were not required to make either of those choices.[10]

---

[9] The statutory framework, in conjunction with Goal 11 and its implementing rules, appear to create a fine, but important, distinction between elements of local government decisions adopting public facilities plans that do, and those that do not, constitute land use decisions. As LUBA explained:

"While it certainly creates a potential for jurisdictional confusion, ORS 197.712(2)(e) makes it possible for a city or county decision that adopts a public facility plan to be both a land use decision and a decision that is not a land use decision. Such a decision is not a land use decision and may not be appealed to LUBA for review of the 'timing and financing provisions.' But such a decision is a land use decision and may be appealed to LUBA for review of all other aspects of the public facility plan, if the public facility plan was adopted to comply with ORS 197.712(2)(e) and Goal 11. LCDC's Goal 11 rule includes similar language that makes it clear that the timing and financing provisions of a Goal 11 public facility plan are not to be considered land use decisions. With regard to such timing and financing provisions in a public facility plan, review at LUBA is not available."

*Home Builders Assoc. of Lane Co.*, 50 Or LUBA at 123-24 (footnotes omitted).

[10] It is true that OAR 660-011-0000 states, in part, that the purpose of a Goal 11 public facilities plan

"is to help assure that urban development in such urban growth boundaries is guided and supported by types and levels of urban facilities and services appropriate for the needs and requirements of the urban areas to be serviced, and that those facilities and services are provided in a timely, orderly and efficient arrangement, as required by Goal 11."

However, that rule does not preclude a decision to incorporate into a Goal 11 public facility plan projects that have already been recommended primarily for fiscal or

Thus, we reject petitioners' assertion that the adoption of a public facilities plan without first conforming it to land use planning requirements necessarily "takes the 'planning' out of land use planning" and is "contrary to the Statewide Planning Goals." To the extent that it was established to comply with ORS 223.309, and insofar as its project timing and financing provisions are concerned, the adoption of the MWMC facilities plan was not a land use decision. The fact that other aspects of the plan must conform to land use planning requirements does not compel a different conclusion. *See J.C. Reeves Corp. v. Sherwood Education Dist. 8J*, 126 Or App 578, 581, 869 P2d 885 (1994) (holding that "actions that are not land use decisions or exercises of planning authority do not become subject to the land use laws simply because the body taking them has failed to comply with those laws in some unrelated respect").[11]

Affirmed.

---

environmental reasons that may have little or nothing to do with the statewide planning goals.

[11] Petitioners express concern that respondents may attempt to collect SDC surcharges from contractors for the planned improvements without the facilities undergoing any formal land use review process, resulting in charges being collected for improvements that may never be constructed. Leaving aside whether petitioners' conjecture is well-founded and what remedy might be available to petitioners if respondents were to employ such tactics, it has no bearing on the issue of statutory construction presented in this case.