**STUDENT PUBLIC INTEREST RESEARCH GROUP OF NEW JERSEY, INC.**

v.

**FRITZSCHE, DODGE & OLCOTT, INC., Appellant.**

No. 84–5390.

United States Court of Appeals, Third Circuit.

Argued Dec. 11, 1984.

Decided April 24, 1985.

Sara Boyd Goodman, Joseph E. Irenas (Argued), McCarter & English, Newark, N.J., for appellant.

Bruce A. Terris (Argued), Carolyn A. Smith, Terris & Sunderland, Washington, D.C., Michael Gordon, Gordon & Gordon, West Orange, N.J., for appellee.

Nancy Firestone (Argued), Karen L. Florini, U.S. Dept. of Justice, Washington, D.C., for amicus; Colburn T. Cherney, Associate Gen. Counsel, Environmental Protection Agency, Washington, D.C., of counsel.

Susan C. Renis, Trenton, N.J., for Joseph H. Rodriguez, Public Advocate of State of N.J.

Before GARTH and HIGGINBOTHAM, Circuit Judges, and McGLYNN, District Judge.*

## OPINION OF THE COURT

GARTH, Circuit Judge:

In this interlocutory appeal[1] we are asked to decide whether the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365(b)(1), precludes a private suit to enforce the provisions of the Clean Water Act where the Environmental Protection Agency ("EPA") had already commenced an administrative enforcement proceeding which resulted in a consent order between the EPA and the company alleged to have violated the Act. The district court concluded that the private action was not barred inasmuch as the EPA's administrative enforcement action was not a "court" proceeding within the meaning of the citizen suit provision. The district court held, alternatively, that even if the EPA's action was considered a "court" proceeding, the suit by Student Public Interest Research Group ("SPIRG") was not precluded because the EPA's consent order did not constitute "diligent prosecution" under the citizen suit provision of the Clean Water Act.

After a careful review of the record and an analysis of this Court's decision in *Baughman v. Bradford Coal Co.*, 592 F.2d 215 (3d Cir.), *cert. denied* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979), we affirm the district court's conclusion that the EPA's administrative enforcement action in the instant case was not a "court" proceeding, although we do so for reasons different than those advanced by the district court. Because we find that the EPA's action was not a "court" proceeding, we do not reach the second question of whether the EPA's consent order constitutes "diligent prosecution."

## I.

Appellant, Fritzsche, Dodge & Olcott, Inc. ("FDO"), located in East Hanover, New Jersey, is a manufacturer of fragrances and flavors used in cosmetic products and food. On April 19, 1974, the Administrator of the United States EPA, pursuant to section 402 of the Clean Water Act, 33 U.S.C. § 1342, issued to FDO a National Pollutant Discharge Elimination System (NPDES) permit, authorizing direct discharge by FDO of certain quantities of pollutants from FDO's East Hanover factory into the Passaic River. This permit covered a period of five years and was scheduled to expire on April 30, 1979.

Under the Clean Water Act Amendments of 1972, which include section 402, a direct discharger of pollutants, here FDO, was required to adopt the "best practicable control technology currently available" (BPT) by July 1, 1977, and the "best available technology economically achievable" (BAT)

---

* Honorable Joseph L. McGlynn, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. This is an appeal from the district court's order denying Fritzsche, Dodge & Olcott's motion to dismiss the complaint and granting the Student Public Interest Research Group of New Jersey's motion for partial summary judgment as to Fritzsche, Dodge & Olcott's liability—leaving only the issue of damages unresolved. The district court granted certification under 28

U.S.C. § 1292(b) (1982) and Fritzsche, Dodge & Olcott's petition for permission to appeal was granted by this Court by order dated May 24, 1984. The issues certified on appeal are (1) whether the EPA's enforcement action in this matter has been "in court" within the meaning of 33 U.S.C. § 1365(b)(1)(B); and (2) whether the EPA's enforcement activities in this matter constitute "diligent prosecution" within the meaning of § 1365(b)(1)(B).

by sometime between July 1, 1983 and July 1, 1987. 33 U.S.C. § 1311(b)(1982). The guidelines used in determining the effluent limitations under the BPT and BAT standards are defined by the Administrator of the EPA, *see* 33 U.S.C. §§ 1311(b), 1314(b), 1314(d). Those effluent limitations, in turn, are applied to individual direct dischargers, such as FDO, through NPDES permits issued to the discharger under section 402 of the Clean Water Act. The NPDES permits are designed to transform "generally applicable effluent limitations ... into the obligations (including a timetable for compliance) of the individual discharger." *EPA v. National Crushed Stone Assn.*, 449 U.S. 64, 70, 101 S.Ct. 295, 300, 66 L.Ed.2d 268 (1980) (quoting *EPA v. California ex rel. State Water Resources Control Board*, 426 U.S. 200, 205, 96 S.Ct. 2022, 2025, 48 L.Ed.2d 578 (1976)). Under section 402(k) of the Act, if a discharger is in compliance with its NPDES permit, it is generally deemed to be in compliance with the Act. 33 U.S.C. § 1342(k). Moreover, the monitoring of permit compliance is usually done by the dischargers themselves. Under section 308 of the Clean Water Act, dischargers are required to monitor, record and report to the EPA the level of their own emissions. 33 U.C.S. § 1318. Indeed, in the instant case, SPIRG's claim is based almost entirely on FDO's reports of its own permit violations.

After the EPA issued its April 19, 1974 NPDES permit, FDO expanded its business at its East Hanover plant which resulted in violations of the biological oxygen demand ($BOD_5$) and temperature limits outlined in FDO's original permit. Recognizing that its needs had changed, FDO sought a permit modification from the EPA in January 1975. In October, 1976, the EPA granted the proposed modification, which included a compliance schedule requiring the installation of a treatment system designed to handle increased process wastewater. Under the permit modification, this upgraded treatment system was to be operational by July 1, 1977 and was intended to meet BPT standards.

As it turned out, this system did not become operational until sometime after July 1, 1977. Realizing that installation of its treatment system was suffering from delays, FDO requested an extension under section 309(a)(5)(B)[2] of the July 1, 1977 statutory BPT completion deadline. The EPA denied FDO's request for an extension, citing FDO's failure to meet the "good faith condition" of section 309(a)(5)(B). App. at 155. When the construction delays persisted, the EPA, on September 13, 1977, issued an administrative order to show cause why FDO's violations of its modified permit should not be referred for civil or criminal prosecution under sections 309(b), (c) and (d) of the Clean Water Act, 33 U.S.C. § 1319(b), (c) and (d). App. at 159. After an enforcement conference with FDO, the EPA decided not to continue the administrative enforcement action and not to refer the matter for civil or criminal prosecution.

On June 6, 1979, the EPA issued to FDO a two-year renewal NPDES permit. Since, at the time the EPA issued the renewal permit, there were no EPA promulgated effluent limitation guidelines for the organic chemicals industry (of which FDO is a part), the limitations in this permit were

---

**2.** Section 309(a)(5)(B) of the Clean Water Act provides:

The Administrator may, if he determines (i) that any person who is a violator of, or any person who is otherwise not in compliance with, the time requirements under this chapter or in any permit issued under this chapter, has acted in good faith, and has made a commitment (in the form of contracts or other securities) of necessary resources to achieve compliance by the earliest possible date after July 1, 1977, but not later than April 1, 1979; (ii) that any extension under this provision will not result in the imposition of any additional controls on any other point or nonpoint source; (iii) that an application for a permit under section 1342 of this title was filed for such person prior to December 31, 1974; and (iv) that the facilities necessary for compliance with such requirements are under construction, grant an extension of the date referred to in section 1311(b)(1)(A) of this title to a date which will achieve compliance at the earliest time possible but not later than April 1, 1979.

33 U.S.C. § 1319(a)(5)(B)(1982).

based on the best professional judgment (BPJ) of the EPA and the projected performance of the upgraded treatment system. Although the EPA authorized the New Jersey Department of Environmental Protection (NJDEP) to issue NPDES permits beginning in April, 1982, the terms of FDO's subsequent permits remain the same as its renewal permit.

Approximately one year after the issuance of the renewal permit, FDO began to intermittently exceed its limitations for total suspended solids (TSS), despite its attempts to remedy the problem. On September 30, 1982, in response to FDO's numerous TSS violations, the EPA issued another order to show cause why the case should not be referred to the Department of Justice for judicial prosecution. In response, FDO submitted a report which detailed its efforts to remedy the TSS permit violations and requested an adjournment of the November 29, 1982 enforcement conference due to the fact that the prior six months monitoring period indicated that FDO was in compliance with its permit limitations. The EPA postponed the enforcement conference, but after a further review of FDO's monitoring reports, the EPA rescheduled the enforcement conference for April 20, 1983.

The April 20, 1983 enforcement conference was attended by representatives from the EPA, the NJDEP and FDO. At this informal meeting, the EPA and FDO discussed at length FDO's permit violations and enforcement efforts. The meeting ultimately resulted in a consent order between the EPA and FDO, in which FDO agreed to discharge its process wastewater into a municipal sewer system then under construction in East Hanover, New Jersey. Apparently, this "hook up," which was to be completed by December 31, 1984, was to permanently resolve the problem of FDO's noncompliance with its NPDES permit. Although the consent order did not address FDO's past permit violations, it did require FDO to (1) submit a report detailing its actions to attempt to achieve past and future compliance with its permit; (2) use its "best efforts to ... minimize incidents of

noncompliance" with its permit until December 31, 1984; and (3) comply with its permit beginning December 31, 1984. App. at 302–07.

On March 4, 1983, before the EPA's rescheduled enforcement conference, appellees, Student Public Interest Research Group of New Jersey, Inc., and Friends of the Earth ("SPIRG"), sent letters to the EPA, the NJDEP, and FDO, notifying them that SPIRG intended to initiate a citizen suit against FDO for violations of its permit. These letters were sent pursuant to section 505(b)(1) of the Clean Water Act, 33 U.S.C. § 1365(b)(1), which provides that citizens may sue to enforce the requirements of the Act, represented in the present case by FDO's permit limitations, after giving 60 days' notice to the EPA, the company involved, and the state in which the alleged violations occurred.

On April 29, 1983, FDO responded to SPIRG by letter. In the letter FDO detailed the measures it had taken to remedy its permit violations and also discussed the April 20, 1983 conference FDO had with the EPA and the NJDEP. FDO also informed SPIRG that a consent order between FDO and the EPA had been agreed upon at this conference.

On May 4, 1983, SPIRG filed suit alleging that FDO was in violation of sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1342, as a result of its NPDES permit violations. SPIRG maintained that since May, 1980, FDO had violated its permit limitations for $BOD_5$ three times, for temperature 58 times, and for TSS 179 times. SPIRG sought declaratory and injunctive relief and the imposition of civil penalties against FDO.

On May 26, 1983, SPIRG wrote to the EPA and FDO's counsel, requesting that it be allowed to participate in any negotiation concerning FDO's compliance with its permit. In the letter, SPIRG also argued that the consent order, described to SPIRG in FDO's April 29, 1983 letter, was illegal. The EPA never responded to SPIRG's request.

On February 16, 1984, the district court granted SPIRG's motion for partial summary judgment on the issue of liability. The main issue before the district court was whether SPIRG could maintain a citizen suit under section 505(b)(1) of the Clean Water Act, 33 U.S.C. § 1365(b)(1), given the fact that the EPA had already initiated an administrative enforcement proceeding which resulted in a court-enforceable consent order. The district court concluded that, despite the actions of the EPA, SPIRG was not precluded under section 505(b)(1) from bringing this suit. FDO appeals.[3]

## II.

Section 505 of the Clean Water Act, 33 U.S.C. § 1365, confers jurisdiction on federal district courts over suits commenced by private citizens against any person in violation of the effluent limitations standards established under the Act. However, section 505 goes on to set out the conditions which must be satisfied before a suit may be initiated. No citizen suit may be commenced under section 505(b)(1)(B):

> [I]f the Administrator or State has commenced and is *diligently prosecuting a civil or criminal action in a court of the United States,* or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right.

33 U.S.C. § 1365(b)(1)(B) (emphasis added). Thus, under section 505(b)(1)(B), a court does not have jurisdiction to entertain a private suit brought to enforce the provisions of the Clean Water Act, if (1) an agency has already commenced a "court" proceeding; and (2) such a proceeding is being "diligently prosecuted."

In the instant case, FDO contends that SPIRG's suit is barred by operation of the two-prong preemption test set out in section 505 of the Clean Water Act. FDO argues that the EPA's administrative enforcement action constitutes a "court" proceeding within the meaning of the Act and that since the enforcement action ultimately resulted in a consent order, such an action was "diligently prosecuted." We disagree. In our view, the EPA's administrative action in the present case cannot be characterized as a "court" proceeding and accordingly, we affirm the district court's decision that it had jurisdiction over SPIRG's citizen suit. Because we find that the EPA's action is not a "court" proceeding (and fails the first prong of section 505's preemption test), we need not address the second issue of whether the consent order constitutes "diligent prosecution."

### A.

Our discussion of whether an administrative enforcement action may properly be characterized as a "court" proceeding within the meaning of the citizen suit provision of the Clean Water Act must necessarily begin with this Court's decision in *Baughman v. Bradford Coal Co.,* 592 F.2d 215 (3d Cir.), *cert. denied,* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979). In *Baughman,* several residents of Pennsylvania initiated an action under the Clean

---

**3.** On appeal, both the New Jersey Department of the Public Advocate and the State of New York submitted amicus curiae briefs in support of SPIRG's position that the EPA's administrative action does not preempt SPIRG's citizen suit, since the EPA's action was not a "court" proceeding and was not "diligently prosecuted" within the meaning of the citizen suit provision of the Clean Water Act. 33 U.S.C. § 1365(b)(1).

So as to determine the EPA's position on these issues, this Court requested that the EPA express their views at oral argument and in an amicus brief to be filed after oral argument. During oral argument and in their amicus brief in support of SPIRG, the EPA maintained that its administrative enforcement action was not a "court" proceeding within the meaning of the citizen suit provision of the Clean Water Act. The EPA further argued in its brief that, even if this Court were to hold that the EPA's enforcement action constituted a "court" proceeding, the administrative action was not "diligently prosecuted." In the EPA's view, therefore, SPIRG should not be barred from pursuing its suit under section 505 of the Clean Water Act, despite the fact that the EPA resolved FDO's permit noncompliance (apparently to the EPA's satisfaction) by entering into a consent order with FDO.

Air Act, 42 U.S.C. § 7401 *et seq.*, against the Bradford Coal Company alleging that Bradford had violated Pennsylvania's clean air standards. The residents filed their suit in the district court on December 27, 1976. Sometime thereafter, the Pennsylvania Department of Environmental Resources ("DER") also began an action before the Pennsylvania Environmental Hearing Board for civil penalties against Bradford. On October 15, 1977, however, the DER ended its action by entering into a consent order of settlement with Bradford. The residents continued their federal suit.

In analyzing whether the residents' citizen suit was barred under the Clean Air Act, this Court examined section 304[4] of the Clean Air Act, 42 U.S.C. § 7604, to determine whether the DER civil penalty action before the State Hearing Board constituted a "civil action in a court." At the time *Baughman* was decided, the issue of whether an agency proceeding could be properly characterized as a "court" action under the citizen suit provisions of the Clean Air or Clean Water Acts had not been addressed by any federal court. The *Baughman* court determined that the purpose behind the citizen suit provision was "to both goad the responsible agencies to more vigorous enforcement of the anti-pollution standards and, if the agencies remained inert, to provide an alternative enforcement mechanism." 592 F.2d at 218. Accordingly, this Court held that for a state administrative board to be a "court" under the citizen suit provision, "that tribunal must be empowered to grant relief which will provide meaningful and effective enforcement of [the company's effluent restrictions]." *Id.* We went on to hold that such a tribunal *"must have the power to accord relief which is the substantial equivalent to that available to the EPA in federal courts under the Clean Air Act."* 592 F.2d at 219. Applying this analysis to the administrative enforcement procedure in *Baughman*, this Court concluded that the Pennsylvania Environmental Hearing Board was not a "court" because (1) it lacked the capacity to enjoin violations of the company's effluent restrictions, and (2) was empowered only to assess a penalty which could not exceed $10,000.

In *Baughman*, still another ground militated against characterizing the Board as a court: namely the lack of citizen intervention of right in the agency proceeding. In highlighting the significance of citizen intervention, this Court relied on 42 U.S.C. § 7604(b)(1)(B), which provides that citizens may intervene as a matter of right in an agency suit in federal court to enforce the Clean Air Act. We went on to emphasize that the Pennsylvania State Hearing Board did not resemble a court because a citizen could not intervene of right before the Board. Rather, under the Board's procedures, a citizen had to first obtain Board permission, which the Board could, in its discretion, withhold. The *Baughman* court emphasized, however, that it did "not decide whether the lack of citizen intervention of right, alone, is a sufficient basis to

---

4. Section 304 is the citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604. It is identical in wording to section 505 of the Clean Water Act, 33 U.S.C. § 1365. Indeed, this Court in *Baughman v. Bradford*, 592 F.2d 215 (3d Cir.), *cert. denied*, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979) treated the two citizen suit provisions interchangeably, stating that it could "find no cases construing section 7604(b)(1)(B) of the Clean Air Act or *its equivalent* in [section 505(b)(1)(B) of] the Federal Water Pollution Control Act, 33 U.S.C. § 1365(b)(1)(B)." 592 F.2d at 217 (emphasis added). Nevertheless, SPIRG contends that this Court's decision in *Baughman* is inapposite to the instant case since *Baughman* involved the Clean Air Act rather than the Clean Water Act.

Because the language of the two citizen suit provisions is identical, as this Court in *Baughman* recognized, we reject SPRIG's argument. We note as well that we are not alone in this respect in that no court has distinguished these two citizen suit provisions in the way suggested by SPIRG. *See Proffitt v. Commissioners, Township of Bristol, et al.,* 754 F.2d 504 (3d Cir.1985); *Student Public Interest Research Group of New Jersey v. Monsanto Co.,* No. 83-2040 (D.N.J. 1983); *Hudson River Sloop Clearwater Inc. v. Consolidated Rail Corporation,* 591 F.Supp. 345 (N.D.N.Y.1984); *Friends of the Earth, et al. v. Consolidated Rail Corporation,* 22 Env't Rep.Cas. 1146, (N.D.N.Y.1984); *Love v. New York State Dept. of Environmental Conservation,* 529 F.Supp. 832 (S.D.N.Y.1981).

find an otherwise competent tribunal not to be a 'court' ...." 592 F.2d at 219 n. 5.

Thus, in *Baughman,* we held that before an agency proceeding can be characterized as a "court" under the citizen suit provision, a dual inquiry must be made. The first question to be answered is whether the coercive powers that the administrative agency possesses compel compliance with effluent limitations (to determine whether the agency has "the power to accord relief which is the substantial equivalent to that available to the EPA in federal court"). The second inquiry concerns the procedural similarities the agency proceeding might have to a suit in federal court (to determine, among other things, whether citizens have a right to intervene in the agency proceeding). We observe that other courts which have considered the question of whether an agency action has precluded a citizen suit under the Clean Air and Water Acts have similarly adopted the *Baughman* analysis. These district courts, all within the Second Circuit, have applied the *Baughman* factors to determine, with differing results, whether the administrative enforcement proceedings of the New York State Department of Environmental Conservation (NYDEC) could properly be characterized as "court" proceedings. *See Gardeski v. Colonial Sand & Stone Co., Inc.,* 501 F.Supp. 1159 (S.D.N.Y.1980) (NYDEC is a "court"); *Hudson River Sloop Clearwater Inc. v. Consolidated Rail Corporation,* 591 F.Supp. 345 (N.D.N.Y.1984) (NYDEC is a "court"); *Friends of the Earth, et al. v. Consolidated Rail Corporation,* 22 Env't Rep.Cas. 1146, (N.D.N.Y. 1984) (NYDEC is a "court"); *Love v. New York State Dept. of Environmental Conservation,* 529 F.Supp. 832 (S.D.N.Y.1981) (NYDEC is not a "court"); *Sierra Club v. SCM Corp.,* 572 F.Supp. 828 (W.D.N.Y. 1983) (NYDEC is not a "court").

#### B.

In the instant case, the district court, accepting *Baughman* as the controlling precedent, held that the EPA is not a "court" under section 505(b)(1)(B) of the Clean Water Act. *Student Public Interest Research Group v. Fritzsche, Dodge & Olcott, Inc.,* 579 F.Supp. 1528 (D.N.J.1984). In reaching its conclusion, however, the district court did not rely on the EPA's lack of coercive or enforcement powers. Instead, the district court refused to characterize the EPA's administrative action as a "court" proceeding because the EPA rebuffed SPIRG's requests to participate in the negotiations between the EPA and FDO. The district court held that "where the EPA fails to allow participation by citizen groups in its enforcement proceedings, it will not be accorded 'court status' and therefore plaintiffs can maintain their suit." 579 F.Supp. at 1534.

■ In essence, the district court established citizen involvement as a dispositive factor, rather than just one of many factors, to be used in determining whether administrative proceedings should have a preclusive effect on private suits. While we recognize "the salutory effects of [allowing the participation of] citizen gadflies" in agency proceedings, *Baughman, supra,* at 219, we nevertheless believe that the "openness" of an agency proceeding to public intervention should remain, as this Court held in *Baughman,* just one of several factors. 592 F.2d at 219. Accordingly, we will examine, in turn, both the enforcement powers of the EPA and the procedures followed by the EPA in its enforcement action, to determine whether the EPA's proceeding in the instant case should be accorded "court" status.

### III.

#### A.

■ The EPA is the agency that Congress charged with enforcing the provisions of the Clean Water Act, and as such, the EPA has certain powers to compel compliance with the Act. *See* 33 U.S.C. § 1319(d). Those powers, however, with the exception of the EPA's broad authority over the establishment of NPDES permits, are rather limited in nature. The EPA, under the Clean Water Act, has the author-

ity to issue NPDES permits, modify permits, and terminate permits for noncompliance with the effluent limitations, as well as for other reasons. *See* 40 C.F.R. 122.-64(a). The EPA also has the power to "issue an order requiring [a permittee] to comply with [the permit] condition or limitation." 33 U.S.C. § 1319(a)(1), (2). However, these administrative enforcement orders are not self-executing. If a discharger fails to comply with an order, a separate enforcement action must be filed and litigated in a district court. 33 U.S.C. § 1319(b), (d). Thus, the EPA itself is without power to enforce its compliance orders or its consent orders.

More importantly, under the Clean Water Act, the EPA's administrative enforcement authority is limited to the issuance of administrative orders, and does *not* include the power to impose administrative penalties.[5] 33 U.S.C. § 1319(a). In *Baughman,* one of the reasons this Court denied "court" status to the Pennsylvania Environmental Hearing Board was because the Board was "empowered only to assess a penalty which cannot exceed $10,000 plus $2,500 for each day of continuing violation of the [effluent limitations]. Thus, the maximum potential financial deterent available to the Hearing Board is merely one-tenth that wielded by federal courts." 592 F.2d at 219. Here, the EPA lacked authority in its administrative proceeding to impose *any* civil penalty. If the EPA in the instant case sought to enforce the Clean Water Act by instituting an action in federal district court, rather than by initiating

its own informal enforcement action, the court could have imposed a maximum civil penalty of $10,000 per day of violation. 33 U.S.C. § 1319(d). It thus appears, given the EPA's inability to impose civil penalties through its agency enforcement proceeding, and the district court's statutory authority to fine up to $10,000 per day, that the EPA's proceeding does not possess the requisite "power to accord relief which is the substantial equivalent to that available to the EPA in federal courts...." 592 F.2d at 219. Consequently, the EPA's administrative action in the instant case does not rise to the level of a "court" proceeding so as to preempt SPIRG's citizen suit.[6]

**B.**

█ The procedures followed by the EPA in its administrative enforcement action also weigh against characterizing the EPA's action in the present case as "court" proceeding. Pursuant to this inquiry, we must first examine whether the agency procedure affords citizens the right to intervene. As was the situation with the Pennsylvania agency in *Baughman,* the EPA does *not* afford citizens the right to intervene in its enforcement and negotiation process. Indeed, as the district court noted, there is evidence to indicate (in the form of SPIRG's unanswered letter to the EPA requesting participation) that the EPA rebuffed attempts by SPIRG to be included in the EPA's enforcement proceedings. This lack of opportunity for public participation in the EPA's administrative

5. Although the Clean Water Act does not explicitly provide that only a court can impose civil penalties to enforce the provisions of the Act, *see* 33 U.S.C. § 1319(d), the EPA has conceded this limitation on its administrative powers both in *City of Baton Rouge v. EPA,* 620 F.2d 478, 480 n. 3 (5th Cir.1980), and in its amicus curiae brief in support of SPIRG in the instant appeal.

6. We note that this result is supported by this Court's decision in *Proffitt v. Commissioners, Township of Bristol,* 754 F.2d 504 (3d Cir.1985). In *Proffitt,* the EPA issued a compliance order to the Bristol Sewer Authority for failure to meet its discharge limitations. The *Proffitt* court con-

cluded, with little discussion, that the EPA's compliance order "lacks the indicia of a 'court action' enunciated in *Baughman* ...." The *Proffitt* court thus reversed the district court and held that the citizen suit brought by Raymond Proffitt was not barred under section 505 of the Clean Water Act.

The instant case, of course, involves an EPA administrative proceeding which culminated in a consent order, rather than a compliance order as in *Proffitt.* Nevertheless, we hold, as did the *Proffitt* court, that the EPA's enforcement action in the present case lacks the requisite indicia of "court action."

action further convinces us that the EPA's enforcement proceeding does not constitute a "court" action.

Finally, the EPA's informal enforcement procedure in the instant case does not otherwise resemble a suit in federal court in that it embraces none of the procedural safeguards found in federal court proceedings. The EPA enforcement process does not incorporate an independent decisionmaker or administrative law judge to weigh the evidence, nor does it allow for opposing parties to present such evidence. In addition, no witnesses are called, no hearing is held, and no formal transcripts or records of decisions are maintained. In short, the EPA's enforcement action bears no procedural similarity at all to a traditional court action. Rather, it consists entirely of private negotiations between the EPA and the discharger—negotiations which are not designed to subsume the procedural protections of the adversarial system.

### IV.

After a careful examination of the EPA's enforcement procedure in the instant case, we conclude that it cannot be characterized as a "court" proceeding within the meaning of section 505 of the Clean Water Act. We note as well that the EPA itself shares our conclusion, as evidenced by the EPA's argument before this Court and its amicus curiae brief submitted in support of SPIRG. Since we find that the EPA's administrative action does not constitute a "court" proceeding and, therefore, does not meet the first prong of the citizen suit provision's preemption of private enforcement, it is not necessary for us to address the second prong of that provision: that the court proceeding be *diligently prosecuted*, 33 U.S.C. § 1365.

Accordingly, we affirm the district court's decision that the EPA's enforcement action does not preempt SPIRG from maintaining its federal suit, and remand to the district court for further proceedings consistent with this decision.