OREGON STATE PUBLIC INTEREST RESEARCH GROUP, INC., Diane Heintz, and Rena Taylor, Plaintiffs,

v.

PACIFIC COAST SEAFOODS COMPANY, Pacific Surimi Joint Venture, LLC, and Pacific Surimi Company, Inc., Defendants.

No. CV 02–924–HA.

United States District Court, D. Oregon.

Sept. 17, 2004.

Charles C. Caldart, Seattle, WA, Joseph J. Mann, Boston, MA, Karl G. Anuta, Sokol & Anuta, P.C., Portland, OR, for Plaintiffs.

Jerry B. Hodson, Suzanne Lacampagne, Hong. Huynh, Miller Nash LLP, Portland, OR, for Defendant.

OPINION AND ORDER

HAGGERTY, Chief Judge.

In July 2002, plaintiffs filed this case, alleging violations of the Clean Water Act (CWA). Plaintiffs allege that defendants are committing ongoing violations of the CWA at their Warrenton, Oregon seafood processing facility. Specifically, plaintiffs claim that defendants are discharging an excess of seafood processing waste into the Skipanon River, a tributary of the Columbia River, causing dissolved oxygen levels to fall to levels that are toxic to aquatic life. Plaintiffs seek a declaration regarding defendants' violations, an injunction requiring defendants to attain compliance and remediate the harm caused by their violations, the imposition of civil penalties, and the award of the costs of litigation as provided by the CWA.

Defendants move for summary judgment. The court heard oral argument on the motion on September 13, 2004. For the following reasons, defendants' motion is denied.

## FACTUAL BACKGROUND

The Clean Water Act (CWA), 33 U.S.C. §§ 1251–1376, is designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). "[T]he cornerstone of the Clean Water Act's pollution control scheme is the National Pollution Discharge Elimination System (NPDES) permit program . . . ." *Natural Res. Defense Council, Inc. v. EPA,* 822 F.2d 104, 108 (D.C.Cir.1987). The Environmental Protection Agency (EPA) is charged with administering the NPDES permit system, but may delegate this authority to the state government. 33 U.S.C. § 1342(b). Oregon's certified NPDES program is managed by the Oregon Department of Environmental Quality (DEQ). O.R.S. 468.035; O.R.S. 468.065; *see also ONRC Action v. Columbia Plywood, Inc.,* 332 Or. 216, 26 P.3d 142, 143 (2001).

Defendants are wholly owned subsidiaries of the Pacific Seafood Group. Plaintiffs allege that defendants have been violating the CWA since Pacific Coast Seafoods Company (Coast) purchased a facility located in Warrenton, Oregon in 1983. At that time, the facility discharged its wastewater into the Skipanon River. In 1986 DEQ conducted a CWA compliance inspection at the facility and cited defendants for failing to perform required monitoring and for also operating without a wastewater discharge permit. The following year Coast applied for, and was granted, a wastewater discharge permit issued by DEQ. The permit set numeric discharge limits for biochemical oxygen demand (BOD), total suspended solids (TSS), oil, and grease. This general seafood permit was re-issued by DEQ in January 1992 (the 1992 NPDES permit).

In June 1995, defendant Pacific Surimi Joint Venture (Surimi JV) leased a portion of the facility and began processing surimi. In June 1999, DEQ renewed the NPDES permit (1999 NPDES permit) for all conventional seafood processors, but excluded surimi operators from the permit. The 1999 NPDES permit instead required surimi-processing facilities to apply for individual NPDES permits. Rather than issuing an individual permit to defendants for its surimi operations, DEQ entered into a stipulated consent order (SCO) with Surimi JV in June 1999 (the 1999 SCO).

On May 10, 2000, DEQ issued a Notice of Noncompliance (NON) to Coast for permit violations regarding the existing source limitations for TSS during January and February 2000. In July 2000, DEQ issued another NON to Coast for violations regarding the existing source limitations for TSS in May 2000. This NON warned Coast against additional violations. Also in July 2000, DEQ issued a NON to

Surimi JV for exceeding the monthly average for biological oxygen demand as set by the 1999 SCO. In September 2000, DEQ issued a NON to Coast for violations occurring in July 2000 and stated that the matter was being referred to DEQ's enforcement section. A year later, DEQ issued another NON to Surimi JV for exceeding the monthly average for oil and grease and stated that it was recommending enforcement action that could result in administrative penalties.

Following the issuances of the NONs, defendants discussed possible long-term solutions for the facility's wastewater with DEQ, including discharging somewhere other than the Skipanon River. Plaintiffs contend that defendants were aware of—but did not invoke—at least five alternate treatment technologies, including wastewater acidification, dissolved air floatation, ultrafiltration, biological treatment, and sedimentation.

Beginning in 2001, Coast and Surimi JV began holding informal meetings with stakeholders, political representatives, and members of the community to develop several long-term solutions for the wastewater. Coast, Surimi JV, and DEQ held meetings with stakeholders to discuss the following options: (1) discharging to the municipal system; (2) improving the facility's existing pre-treatment system; (3) constructing a pipeline for discharge to the Columbia River; (4) discharging to a golf course; and (5) closing the facility.

In the summer of 2001, defendants and the City of Warrenton (hereinafter referred to as the "City") collaborated on a joint project to address their respective discharges. The City is subject to a mutual agreement and order (MAO) designed to achieve compliance with the CWA by December 2005, contingent on approval by DEQ. The MAO provides for its own modification under a variety of circumstances, which could push the compliance deadline

beyond December 2005. The requirement for DEQ approval of plans and specifications has no fixed deadline.

In December 2001, defendants proposed a four-phase compliance schedule to DEQ to find a viable economic solution to bring each company into compliance with the 1999 NPDES permit and 1999 SCO by early 2006. No definite time frame for compliance was proposed. In response to the proposal, DEQ sent Coast a draft MAO outlining a schedule and a NON summarizing permit violations from October 2000 through June 2001. The draft MAO provided for its own modification under a variety of circumstances, so any compliance schedule established was subject to change.

The DEQ issued another NON to Coast in February 2002 stating that the matter had been recommended for enforcement action and could result in administrative penalties. Two months later, plaintiffs sent defendants a notice of intent to sue. In May 2002, plaintiffs sent a notice of intent to sue defendant Surimi Company, Incorporated, and an amended notice to Coast and Surimi JV.

Since plaintiffs filed this lawsuit in July 2002, defendants have continued to work with DEQ to finalize the proposed MAOs for Coast and Surimi JV (the draft SCO for Surimi JV was replaced by an MAO). Defendants have presented no evidence that these proposed MAOs have been finalized. Surimi JV violated the interim effluent limitations in the proposed MAO in June and July 2003.

Under the current proposal, defendants would not provide any additional treatment of their wastewater prior to discharge to the City's outfall into the Columbia River and the City would provide no treatment of defendants' wastewater. Rather, defendants' wastewater would be pumped to the City's outfall pipe at a point downstream of

the City's treatment plan, and then would be pumped directly into the Columbia River. Recently, Congress appropriated sufficient funds to pay for most or all of the costs of this project.

### STANDARDS

Summary judgment is required when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). That burden may be met by showing that there is an absence of evidence to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. 2548. Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify facts which show a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Id.* at 249, 106 S.Ct. 2505.

The court must view the evidence in the light most favorable to the non-moving party. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 531 (9th Cir.2000). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Addisu v. Fred Meyer, Inc.,* 198 F.3d 1130, 1134 (9th Cir. 2000) (citation omitted). The inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Texas Partners v. Conrock Co.,* 685 F.2d 1116, 1119 (9th Cir.1982). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Jewel Companies, Inc. v. Pay Less Drug Stores N.W., Inc.,* 741 F.2d 1555, 1566–67 (9th Cir.1984). However, if all reasonable inferences are drawn in favor of the non-moving party and the evidence is merely colorable or not significantly probative, summary judgment is appropriate. *Anderson,* 477 U.S. 242 at 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202.

### ANALYSIS

Defendants urge this court to grant summary judgment in their favor for three reasons: (1) plaintiffs' claims are barred because DEQ is prosecuting an action under comparable state law; (2) the court should defer to the state administrative process under the abstention doctrine; and (3) plaintiffs have failed to join indispensable parties, specifically DEQ and the City.

### 1. The DEQ's Prosecution

The CWA allows private citizens to bring enforcement actions against any person alleged to be in violation of federal pollution control requirements. 33 U.S.C. § 1365(a)(1); *Friends of the Earth Inc. v. Laidlaw Envtl. Services,* 528 U.S. 167, 174–75, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). The prospective citizen plaintiff must provide notice of the alleged violation to: (1) the EPA; (2) the state where the alleged violation occurred; and (3) the alleged violator, at least sixty days before filing a suit. 33 U.S.C. § 1365(a)(1). A citizen suit may be brought only if: (1) neither the EPA nor a state agency is "diligently prosecuting" an administrative penalty action before the service of the citizen's notice; or (2) the violator has not paid a state-assessed penalty comparable to Section § 1319(g)(6). 33 U.S.C. § 1365(b); *see also* 33 U.S.C. § 1319(g)(6)(A) (a citizen suit cannot be brought for violations "with respect to

which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection....").

█ The comparable state law must contain penalty provisions and a penalty must actually have been assessed under state law. *See WashPIRG v. Pendleton Woolen Mills*, 11 F.3d 883 (9th Cir.1993). As such, an EPA or state enforcement action that results in a compliance order with no penalty assessment may fall short of constituting a diligent prosecution that could foreclose a citizen suit. *Citizens for a Better Environment-California v. Union Oil Co. of Cal.*, 83 F.3d 1111 (9th Cir.1996); *Nat'l Res. Defense Council v. Fina Oil & Chem. Co.*, 806 F.Supp. 145 (E.D.Tex. 1992). Similarly, a state prosecution does not bar a citizen suit if the state law is not "comparable" to the federal CWA. 33 U.S.C. § 1319(g)(6)(A)(ii). Administrative sanctions such as orders for injunctive or declaratory relief that lack a comparable penalty as an enforcement action also do not bar a citizen suit. 33 U.S.C. § 1319(g); *see also California Sportfishing Protection Alliance v. City of West Sacramento*, 905 F.Supp. 792, 806–07 (E.D.Cal.1995) (holding that Section 1319 clearly bars only civil penalty actions, not claims for injunctive and declaratory relief).

█ Defendants assert that plaintiffs' claims should be barred because prior to plaintiffs' amended notice on May 8, 2002, DEQ had already commenced and was diligently prosecuting an action under comparable state law. Defendants assert that a state action is commenced in Oregon when the state "first notifies a person in writing that a violation has been documented and that the violation is being referred for formal enforcement action or will result in a civil penalty or other formal enforcement action." O.R.S. 468B.032(8). The DEQ notified Coast and Surimi JV that violations were documented and that DEQ was recommending enforcement action prior to

plaintiffs' notice of intent to sue. Consequently, defendants argue that plaintiffs' citizen suit is barred and this court lacks subject matter jurisdiction.

This argument is without merit. Section 1319(g)(6) provides that there must be prior commencement of administrative penalty actions under comparable state law before CWA penalty actions are precluded. According to the EPA regulations implementing Section 1319(g)'s penalty provisions, a proceeding is commenced upon either the filing of an administrative complaint or the issuance of a finalized consent agreement. 40 C.F.R. § 22.13. Conversely, O.R.S. 468B.032 provides that an administrative penalty action may commence upon the issuance of a NON and a threat of possible further enforcement. Furthermore, O.R.S. 468B.032 permits a "formal enforcement action" other than an administrative penalty action to trigger Section 1319(g)'s jurisdictional bar. Such a provision renders the state statute non-comparable with Section 1319(g).

Moreover, courts have held that non-penalty administrative orders may not preclude subsequent citizen suits. *See, e.g., Kara Holding Corp. v. Getty Petroleum Marketing, Inc.*, 67 F.Supp.2d 302 (S.D.N.Y.1999); *United States v. Smithfield Foods, Inc.*, 972 F.Supp. 338 (E.D.Va. 1997).

In *Sierra Club v. Hyundai America, Inc.*, 23 F.Supp.2d 1177 (D.Or.1997), this court addressed when a state enforcement action is comparable to the CWA in order to find preclusion of a citizen suit. Defendant Hyundai America argued that the DEQ's issuance of a NON was an administrative penalty enforcement action that qualified as a comparable state law action under the CWA. *Id.* at 1181. In rejecting the defendant's assertion, this court reasoned that the provisions of Section 1319(g)(6) are designed to preclude citizen

suits that would be duplicative of an administrative penalty action, and that a NON is essentially an administrative compliance order, not a penalty action. *Id.* (citations omitted). Because the DEQ did not assess penalties to the defendant until after the commencement of the plaintiffs' citizen suit, and failed to take enforcement action comparable under state law, the plaintiffs' suit was not precluded. *Id.* at 1182.

In this case, the DEQ has not assessed a penalty to Coast, and Coast has not paid such a penalty. Although the DEQ issued several NONs to Coast for violations of the 1999 NPDES permit, these did not impose a penalty, nor did they refer the matter for the imposition of a penalty. Rather, the NONs stated that the matter was being turned over to the DEQ Enforcement Section with a *recommendation* that enforcement action be taken and that administrative penalties could be imposed.

With respect to Surimi JV, DEQ issued a second NON for violations of the 1999 SCO. The authority for penalty action under the SCO was contained in the SCO itself (stipulated penalties of $500 per violation of a discharge limitation or $250 for each day of noncompliance). It was not an administrative penalty action comparable to Section 1319(g), which allows for penalties of up to $10,000 per day. Even assuming *arguendo* that the SCO was comparable action under state law, it did not commence until after plaintiffs served their notice letter on May 8, 2002. The SCO penalty provision could only be triggered upon a Penalty Demand Notice (PDN) issued by DEQ. DEQ did not send a PDN to Surimi JV until the summer of 2002.

■ This court construes the "diligent prosecution" bar narrowly in accordance with the intent of the CWA to prevent recalcitrant violators from escaping liability. *See, e.g., WashPIRG,* 11 F.3d at 886

(CWA "unambiguously bars suits only when the EPA has instituted an administrative penalty action"); *Student Pub. Interest Research Group v. Fritzsche, Dodge & Olcott, Inc.,* 759 F.2d 1131 (3rd Cir. 1985). Nothing presented by the parties establishes that the DEQ's prosecution meets such stringent standards. For all the reasons provided above, the court concludes that plaintiffs' citizen suit is not barred and this court has subject matter jurisdiction to hear plaintiffs' claims.

## 2. The Abstention Doctrine

■ Alternatively, defendants urge this court to defer to the state administrative process and dismiss this action in accordance with the abstention doctrine recognized in *Burford v. Sun Oil Company,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) (the *"Burford* abstention"). Defendants argue that abstention is appropriate because DEQ is actively overseeing a compliance scheme to which defendants and the community are contributing.

In *Burford,* the Sun Oil Company brought suit in federal district court, based on diversity jurisdiction, seeking to cancel the Texas Railroad Commission's grant of certain oil drilling permits. Alternatively, Sun Oil sought to enjoin the drilling and operation of new wells and prevent the Commission from extracting more than their fair share of oil. *Burford,* 319 U.S. at 317, 63 S.Ct. 1098. The district court dismissed the case, holding that although federal courts had jurisdiction to hear the case, in general, environmental conservation cases should be relegated to state courts. *Sun Oil Co. v. Burford,* 124 F.2d 467, 468 (5th Cir.1941). The Fifth Circuit reversed. On appeal to the Supreme Court, the Court agreed with the district court's dismissal, reasoning that due to the "geologic realities" of oil and gas, the Commission had created a comprehensive, cen-

tralized state regulatory system designed to conserve resources and allocate drilling rights. *Burford,* 319 U.S. at 318, 63 S.Ct. 1098. Additionally, the Court recognized that the Texas legislature had streamlined all direct reviews of the Commission's orders to the state courts. *Id.* at 326, 63 S.Ct. 1098. Thus, acknowledging the specialized system of state administration that affected issues of vital local concern, the Court affirmed the district court's dismissal of the case. *Id.* at 332–34, 63 S.Ct. 1098.

■ District courts have a duty to decide cases that are properly before them. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Notwithstanding this duty, a *Burford* abstention allows a federal district court to abstain from exercising its jurisdiction if the case presents "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar," or if the federal court's decision "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Id.* at 814, 96 S.Ct. 1236.

■ *Burford* marks an "extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it." *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 728, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (citations omitted). While district courts may abstain to avoid interfering with complex state administrative processes, abstention is not required—and may not be prudent— "whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy." *New Orleans Pub. Service v. New Orleans,* 491 U.S. 350, 362, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989).

The Ninth Circuit has directed district courts to consider the following factors when faced with the issue of whether to abstain: (1) whether the state has chosen to concentrate suits challenging the actions of the agency involved in a particular court; (2) whether it would be difficult to separate federal issues from complex state law issues with which the state courts may have specialized knowledge; and (3) whether federal review would interfere with state efforts to establish and maintain a coherent policy. *United States v. Morros,* 268 F.3d 695, 705 (9th Cir.2001).

Defendants argue that this court should abstain because the state of Oregon considers the discharge of wastewater to public waters to be a matter of critical public concern. Moreover, Oregon has obtained authority from the federal government to administer the federal NPDES program. *See* O.R.S. 468B.030,.035(1). Defendants have held meetings with members of the local community and stakeholders to agree on an appropriate plan. Toward this end, defendants, DEQ, and the City have collaborated to develop a long-term compliance scheme that includes upgrading the City's wastewater treatment system and eliminating the need to discharge to the Skipanon River. Defendants contend that these efforts have been recognized favorably by the federal government through the provision of funding that will pay for most of the costs of construction.

However, several courts have found that the CWA citizen suit provision is intended to supplement state government actions, essentially rendering the *Burford* doctrine inapplicable. *See, e.g., Cmty. of Cambridge Envtl. Health and Cmty. Dev. Group v. City of Cambridge,* 115 F.Supp.2d 550, 560–61 (D.Md.2000) (to apply the *Burford* doctrine to CWA citizen suits would essentially derogate the policy choices made by Congress); *Culbertson v.*

*Coats Am., Inc.,* 913 F.Supp. 1572, 1578 (N.D.Ga.1995); *Natural Res. Def. Council, Inc. v. Outboard Marine Corp.,* 692 F.Supp. 801, 810 (N.D.Ill.1988); *Brewer v. City of Bristol, Tenn.,* 577 F.Supp. 519, 524 (D.C.Tenn.1983) (citations omitted).

These cases reason that by enacting the CWA Congress created a widespread federal system of regulation, from which an area for state enforcement was carved. To avoid violating federal law, state laws and regulations must satisfy specific requirements set forth in the federal laws and regulations. Accordingly, state courts have no greater competence or expertise than federal courts in interpreting such laws. *See United States v. Cargill, Inc.,* 508 F.Supp. 734, 746–47 (D.C.Del.1981).

Applying the factors provided by the Ninth Circuit in *Morros* to this case establishes that abstention is inappropriate. First, Oregon has not chosen to concentrate CWA citizen suits in a particular court. In fact, Oregon does not allow for CWA citizen suits. *See* O.R.S. §§ 468B.005–468.035. Moreover, Congress has explicitly granted jurisdiction to federal district courts to hear CWA citizen suits. 33 U.S.C. § 1365(a). Second, separating federal issues from state law issues is simple in this case because there are no difficult questions of state law presented. Plaintiffs have not pled any state law claims. Third, federal review would not interfere with the state's efforts to establish and maintain a coherent enforcement policy. The efficacy of a state's administration of the NPDES program is not a concern unique to the states, particularly in light of the national interest in controlling water pollution. Accordingly, this court declines to abstain from exercising its jurisdiction in this case.

**3. Indispensable Parties**

Defendants' final argument for dismissal of this case is that plaintiffs have failed to join the City and DEQ as parties. Defendants argue that both of these entities are necessary and indispensable because no injunctive relief can be fashioned without their involvement. *See* Fed. R.Civ.P. 19; *see also Makah Indian Tribe v. Verity,* 910 F.2d 555, 558 (9th Cir.1990) (in determining whether an action should be dismissed under Rule 19, courts look to whether the absent party is necessary and indispensable). Defendants bear the burden of producing evidence demonstrating that the City and DEQ are necessary and indispensable parties. *Makah Indian Tribe,* 910 F.2d at 558.

A party is necessary if, in its absence, "complete relief cannot be accorded among those already parties" or the party has an interest relating to the subject of the action and its absence may impair or impede its ability to protect that interest or leave other persons at risk of incurring multiple or inconsistent obligations. Fed.R.Civ.P. 19(a).

If a necessary party cannot be joined for practical or jurisdictional reasons, "the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed . . . ." Fed.R.Civ.P. 19(b). Joinder is not feasible if the court lacks subject-matter jurisdiction of the non-party, the court cannot exercise personal jurisdiction over the non-party, or the non-party objects to the venue. Fed.R.Civ.P. 19(a). The following factors are to be considered: (1) the extent to which a judgment rendered in the party's absence may prejudice that party or those already parties; (2) whether such prejudice can be lessened or avoided; (3) whether a judgment rendered in the party's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action was dismissed. Fed.R.Civ.P. 19(b).

Defendants argue that the City and DEQ are necessary parties because in their absence this court would be unable to fashion complete injunctive relief and their absence could subject defendants to incurring obligations in this lawsuit that would be inconsistent with obligations imposed in DEQ's enforcement proceeding. Defendants claim that they have identified a solution to the discharge problem that involves connecting to the City's proposed treatment system. These proposed treatment facilities are anticipated to be completed by late 2005, early 2006. According to defendants, this proposal has been the only feasible compliance measure identified to date and defendants' compliance efforts are dependent upon the City's proposed facilities, as well as DEQ's oversight of the progress. Additionally, without the inclusion of the City and DEQ, defendants believe they would be subject to potential orders of this court that might be inconsistent with requirements administered by DEQ in its enforcement proceeding.

■ However, the purpose behind the citizen-suit provision in the CWA is to ensure enforcement of federal environmental requirements irrespective of the actions of state agencies. The CWA plainly and unambiguously confers an opportunity among citizens to sue alleged violators when government agencies fail to act. *Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1014 (9th Cir.2002); *see also Friends of the Earth v. Carey*, 535 F.2d 165, 173 (2d Cir.1976) (EPA not a necessary party in Clean Air Act citizen suit).

The Ninth Circuit has adopted the principle articulated in *Carey* that when a citizen seeks to enforce the terms of an NPDES permit, a pollution abatement plan, or the statutory requirements of the CWA, "it is the government agency's alleged failure to act that 'brings the citizen suit into play.' " *Id.* (quoting *Carey*, 535

F.2d at 173). In addition, *Hammersley* provides that generally, state agencies empowered to administer federal environmental programs are not necessary, let alone indispensable, parties to citizen suits. *See also Metro. Wash. Coalition for Clean Air v. Dist. of Columbia*, 511 F.2d 809, 814–15 (D.C.Cir.1975) (per curiam); *Student Pub. Interest Research Group of N.J., Inc. v. Monsanto Co.*, 600 F.Supp. 1479, 1484 (D.N.J.1985).

The court concludes that it is capable of awarding complete relief to plaintiffs without joining the City or DEQ. District courts are permitted to enforce the provisions of the CWA with or without the presence of administrative agencies. 33 U.S.C. § 1365; *Monsanto*, 600 F.Supp. at 1484. Moreover, neither the City nor DEQ claims any legally protectable interest in this action. Accordingly, Rule 19(a)(2) does not apply. *Hammersley*, 299 F.3d at 1015 (Rule 19(a)(2) was "wholly inapplicable" because the agency failed to claim an interest that would be impaired by the litigation); *see also Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1043 (9th Cir.1983) (an essential prerequisite to joinder under Rule 19(a)(2) is that the non-party claims an interest in the action).

Consequently, the court need not decide whether this case may subject defendants to multiple or inconsistent obligations. Even if the City or DEQ had claimed a legally protectable interest in this suit, this court could fashion meaningful relief without subjecting defendants to multiple or inconsistent obligations. For example, should DEQ issue an enforcement order, this court could still issue an injunction consistent with DEQ's order. Similarly, should DEQ decide to issue an administrative penalty, this court could account for that in assessing an appropriate penalty in this case. *See generally*, 33 U.S.C.

§ 1319(d). Moreover, dismissal is unwarranted because neither the City or DEQ is an indispensable party. Neither the City or DEQ is prejudiced by an absence in this litigation, and the court is capable of fashioning an appropriate remedy in these entities' absence.

## CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment (Doc. # 21) is DENIED.

IT IS SO ORDERED.